NATHANIEL L. GRISWOLD, and GEORGE GRISWOLD, Plaintiffs in Error,

*against*

JOSHUA WADDINGTON, *who is impleaded with* HENRY WADDINGTON, Defendant in Error.

As soon as a war is commenced, all trading, negotiation, communication or intercourse between the citizens of this country and the enemy, without the direct permission of government, is unlawful.
Therefore, no valid contract can exist, nor any promise arise by implication of law,

THIS cause came before this court, on a *writ of error* to the Supreme Court. (*S. C.* 15 *Johns. Rep.* 57.)

The plaintiffs in error, brought an action of *assumpsit* against the defendant in error, to recover 3627*l.* 11*s.* 1*d.* sterling, the balance of an *account current*, signed by *Henry Waddington, & Co.* dated at *London, January* 1, 1815. The cause was tried at the *New-York* sittings, in *December,* 1816, before Mr. Justice *Van Ness.* It was admitted that the signature to the account current was in the hand writing of *Henry Waddington,* of *London.* This account comprised transactions arising during the year 1814, consisting

from any transaction with an enemy :---And if, after the war has ceased, an action is brought against a citizen here, upon any contract arising out of such illicit intercourse, the defendant may set up the illegality of the transaction, as a defence.
A commercial partnership existing between a citizen of this country and that of another, is dissolved by the breaking out of war between the two countries.

of cash and bills received by *Henry W. & Co.* at *London,* in error, from or on behalf of the plaintiffs.

To prove that the defendant in error was a *partner* of the house of *Henry Waddington & Co.* the plaintiffs gave in evidence, a *petition* presented to the District Court of *New-York,* on the 9th of *March,* 1813, by the defendant, *J. W.,* for the purpose of procuring a remission of the forfeiture of penalties, incurred by the importation of goods from *England,* by *Joshua Waddington & Co.* in 1812. The petition, which was verified by the oath of the defendant, and made under the act of Congress of *January,* 1813, stated that the petitioner was one of the firm of *Joshua Waddington & Co.* of the city of *New-York,* merchants, and that he petitioned in behalf of himself, *Henry Waddington & Robert Newby,* the other member of the said firm :—That the goods were purchased in *England,* prior to any knowledge of the existing war, and were, between the 23d of *June* and 15th day of *September,* shipped for *New-York,* and that, at the time of the shipment and seizure, the goods were owned solely by the defendant, " and his said partners, who were citizens of the *United States.*" In an *affidavit,* annexed to the petition, the defendant also stated, "that the said firm of *J. W. & Co.* was composed of the defendant, *Henry Waddington, & Robert S. Newby,* who were all citizens of the *United States,* and that their business was conducted in *Great Britain,* by the said *H. W.* who also conducts the firm of *H. W. & Co.,* which last mentioned firm was composed of himself, *H. W.* and the defendant."

The plaintiffs also proved, that the ship *Robert Burns,* sailed as a *cartel,* from *New-York* to *England,* in *July,* 1813 ; that the secretary of state, by a letter dated in *June,* 1813, directed the marshal of *New-York,* to take charge of all letters intended to be sent by that *cartel,* to inspect them, and to detain " all correspondence of an improper character, attempted with the enemy, or persons resident in his dominions." The marshal stated that a number of letters, so sent and inspected, contained *bills of exchange* drawn and remitted by merchants residing in the *United States,* on persons residing in *England,* and that the amount of the bills so sent out by that cartel, was, probably, *one*

IN ERROR. *million* of pounds sterling. That after the cartel had sail-
•••••• ed, he informed the department of state of the amount of
ALBANY, bills sent out ; that one of the plaintiffs went out in that
January, 1819. cartel, in the capacity of a *steward*, and produced no pass-
GRISWOLD port ; and he returned to *New-York* in *May* or *June*, 1814.
v. He did not know whether the bills so forwarded were drawn
WADDINGTON. on funds in *England*, or intended as a remittance of funds
to that country.

The plaintiffs further proved, that the *Fair American*,
sailed as a *cartel* from *New-York* to *England*, in *January*,
1814 ; that the secretary of state, by a letter dated in *De-
cember*, 1813, directed that all letters to be forwarded by
the cartel, should be inspected, and that " no communica-
tions were to go that were of a character hostile to the
government or interest of the country, and that in discrimi-
nating, the marshal was to exercise a liberal discretion."
Bills to the amount of about half a million pounds sterling,
were sent out by this second cartel ; but it did not appear
whether they were drawn on funds in *Great Britain*, or were
remitted to create funds there.

It was also shown, on the part of the plaintiffs, that the
government of the *United States*, during the late war, pur-
chased of individuals, bills of exchange on *England*, to the
amount of 300,000 dollars, for the purpose of paying the
interest on the *Louisiana* debt, and for the relief of our pri-
soners in *England*.

To prove that the partnership between *H. W. & J. W.*
was dissolved by them on the 31st of *December*, 1812, the
defendant produced a letter from *H. W.* to the defendant,
dated the 18th of *January*, 1811, which stated that a disso-
lution of the partnership could not be advertised in the *Ga-
zette*, *according to the desire of the defendant*, without the
signature of both parties ; but that, " as the defendant had
agreed to continue for two years longer, it would be better
for all parties, that it should go on to that period." The
defendant, also, produced another letter from *H. W.* to
him, dated the 9th of *January*, 1813, in which he says, " I
have sent the dissolution of the partnership to the *Gazette*,
and it will be inserted in course :"—That as soon as he had
received the respective settlements of the defendant, he

would attempt one there: That, "a proper line was struck in the books and cash, and you (the defendant) are no longer interested in any losses or profits on this side."

*B. F.* a witness, testified that he entered the counting house of *H. W. & Co.* as a clerk, in *December*, 1813, or *January*, 1814; that *H. W.* entered into large speculations with different persons; that he did not know that the defendant had any interest in the business, or derived any emolument from it, after the defendant became a clerk in the house. That, on the 25th of *March*, 1815, *H. W.* was declared a bankrupt; soon after which the witness left his employment. That in *February*, 1814, the witness saw one of the plaintiffs, *N. L. G.* in *London*, and heard a conversation between him and *H. W.* in which he promised to make good the balance of his account, which was soon after done, by the payment of 537*l.* 1*s.* 10*d.* sterling. That *H. W.* was a *British* subject, and had not been in the *United States* since 1798, and was married and settled in *London*. That he continued to use the firm of *H. W. & Co.* and continued in full credit until his bankruptcy.

*T. L. Ogden*, a witness for the defendant, testified, that he prepared the petition and affidavit presented to the District Court. "That he had no particular instructions from the defendant, and that his attention was called to the persons composing the firm of *H. W. & Co.*, and *J. W. & Co.*, in relation only to the subject matter of the petition;"—"that he had several petitions to prepare, at the time, for other persons, who were anxious to get them forward, and which occasioned a great press of business."

It appeared that a passport had been obtained for *N. L. G.* one of the plaintiffs, who went in the cartel.

Two *accounts current* were produced by the plaintiffs, between them and *H. W. & Co.* for the years 1810, 1811, and part of 1812, which consisted principally of bills of exchange credited and cash paid.

The defendant gave in evidence (1.) a *letter* from *James Stewart* to *H. W. & Co.* dated *Antigua*, 23d of *March*, 1814, stating, that "from the recommendation of Messrs. *N. L.* and *G. Griswold*, he had been induced to endorse to him sundry bills of exchange on *London*, for the sum of 4,358*l.*

17s. 8d. sterling, which he requested them to recover and keep for his order : some of which bills were drawn on the *English* government. (2.) A *letter* from the plaintiffs, to *H. W. & Co.* dated *New-York,* 8th of *July,* 1814, stating, that " early in *May* last, Mr. *Jesse Hurd,* of *Chatham, Connecticut,* received a letter from *James Stewart,* dated *St. Bartholomews,* 4th of *April,* inclosing a copy of the letter of the 23d of *March ;* that the plaintiffs inclosed the original letter of *Stewart,* and *Hurd's* letter to *H. W. & Co.* requesting them to transfer whatever money, in bills, they had, or might receive, as a remittance from *J. S.* or his agent, to the credit of the plaintiffs." (3.) A *letter* from the plaintiffs to *H. W. & Co.* dated *July* 14, 1814, stating that they had received from Captain *James Stewart,* (who had arrived in *Connecticut*) a letter to them, inclosed, directing them to place to the credit of the plaintiffs, the amount remitted to *H. W. & Co.* from *Antigua ;* and which the plaintiffs requested *H. W. & Co.* to do ; and to advise them thereof, that they might draw for the same in favour of the owners.

The judge charged the jury, that they ought to find for the plaintiffs ; and the jury, accordingly, found a verdict for the plaintiff for 17,757 dollars and 9 cents. A bill of exceptions was tendered to the charge of the judge ; and the same was, according to the statute, brought to argument before the court, who, in *January* term, 1818, gave judgment for the defendant ; and to reverse that judgment the writ of error was brought.

SPENCER, Ch. J. assigned the reasons for the judgment of the Supreme Court. (Vide, S. C. vol. 15, p. 57—85.)

*Van Buren,* (*Attorney-General,*) and *Griffin,* for the plaintiffs in error.

*Wells* and *Harison,* for the defendant in error.

The case was very fully argued, and with great learning and eloquence ; but, as almost every topic of discussion and authority cited, may be found in the report of the case in the court below, it is thought unnecessary to repeat what has

been there said, especially as the subject is so fully consider-
ed, and the cases so critically examined, by his honour, the
CHANCELLOR, who has, also, referred to some authorities
not adduced on the argument.

IN ERROR.
.. ....
ALBANY,
January, 1819.
~~~
GRISWOLD
v.
WADDINGTON.

The following additional cases were cited by the counsel
for the plaintiffs. As to the *legality* of the transaction:
*Coolidge* v. *Inglee; (13 Mass. Rep.* 26—33, per *Jackson,* J.)
case of the *Hiram,* opinion of *Davis,* J. in the District
Court of *Massachusetts, February,* 1813. 12 *Mass. Rep.*
10. *Vattel,* b. 3. ch. 10. s. 175. 15 *Johns. Rep.* 6. 7 *Cranch,*
619, 620. *Montesq. Esprit de loix,* b. 1. ch. 3. *Burlamaqui,*
part 4. ch. 9. s. 21. ch. 12. s. 2. : As to the dissolution of the
partnership : 2 *Vesey,* 83. 5 *Vesey,* 296. 424. 2 *Vesey &*
*Beames,* 303. 15 *Vesey,* 218. ; Opinion of *Livingston,* J. de-
livered in the case of *Barker* v. *The United States.* in error in
the Circuit Court of the *United States,* for the District of *New-*
*York,* a MS. case. That it was not such an illegality that
defendant could avail himself of it : 12 *Johns. Rep.* 276. 1
*Bos. & Pull.* 345. 353. 8 *Term Rep.* 562. 4 *Burr.* 2069.
1 *W. Bl.* 653. 1 *Bos. & Pull.* 3. 296.

The defendant's counsel referred to the following autho-
rities, in addition to those cited in the court below : 9
*Cranch,* 198. 1 *Dods. Adm. Rep.* 390. 2 *Wheat.* 204.
6 *Taunt.* 61. 237. 409. 7 *Taunt.* 439. 1 *Moore's Rep.* 133.
1 *Swanton's Rep.* 7. *Evans* v. *Richardson,* 3 *Merivale's*
*Rep. Dec.* 1817. *Marsh. on Ins.* 741. *Denniston & M'Gre-*
*gor* v. *Imbric,* a MS. case, in the Circuit Court of the *United*
*States,* for *Pennsylvania* District, *May* 18, 1818. *Conn &*
*others* v. *Penn,* on the equity side of the same court, *April*
13, 1818, a MS. case.

THE CHANCELLOR. The plaintiffs sue for the balance·
due upon an account current stated and signed by *Henry*
*Waddington,* at *London,* on the 1st of *January,* 1815. This
account current is composed of mercantile transactions,
arising during the year 1814, and consists, on the debit side,
of cash paid, and of portage and commission charges; and
on the credit side, of cash and bills received from or on be-
half of the plaintiffs. This *H. W.* was a natural born sub-
ject of the king of *Great Britain,* and had not been in the

IN. ERROR.
......
ALBANY,
January, 819.

GRISWOLD
.v.
WADDINGTON.

*United States* since the year 1798; he was married and settled in *London*, and had a commercial establishment there; and during the year 1814, was in great credit and carried on very large business. The plaintiffs, on the other hand, were citizens of the *United States*, residing in the city of *New-York*, and one of them, in *July*, 1813, went to *England* in the cartel ship *Robert Burns*, without the production and without the requisite evidence of any passport from our government. He entered himself on the ship's papers as a steward, and told a witness that he was going out in that capacity. He returned to the *United States*, in *May* or *June*, 1814. While in *England*, he was at the counting house of *H. W.*, and promised him to make good the balance of his account; and which was soon done by the cash credited in the account current, as of the 28th of *February*, 1814.

It must be fresh in the recollection of all, that during the years 1813 and 1814, there was open war between *England* and the *United States*.

The plaintiffs, therefore, on the face of their demand, admit that the contract which they now attempt to enforce, was made by them voluntarily with one of the public enemies of their country, in time of war. However writers or judges may differ, as to the nature or kind of unlicensed intercourse, which may be tolerated or endured, in time of war, between the subjects of the hostile states, we, in this case, are relieved from the necessity of drawing distinctions. The intercourse in this case was commercial. The account current, and every part of the testimony, show that the dealing here was between commercial houses, and with commercial paper. For what this paper was originally given, is not disclosed. Some of it was *British* government paper, and we may well presume that these bills were the representative of commercial products, either in the shape of goods, or provisions, or other materials, which the parties have not found it convenient, or 'not found themselves competent to trace.

The great question, then, meets us at the very threshold of this case. Will our courts sustain a suit in favour of a citizen

on his contract made with an enemy, and arising out of his commerce with the enemy in time of war? ∘∘∘

The plaintiffs seek to charge the defendant as a partner of *H. W.*, with whom they so dealt in 1814. They contend that the partnership which existed between the defendant and *H. W.*, before the late war, was, in judgment of law, continued in force during the war, from the want of due notice of its dissolution, and that the defendant is chargeable for all the debts of *H. W.*, created during the war.

If the defendant was chargeable in law, in this case, by reason of such a protracted partnership, it would certainly be a case of great hardship, and a natural sense of justice would induce us to regret such a conclusion. The plaintiffs, who reside in *New-York*, and who were, no doubt, well acquainted with the defendant, have no intercourse with him; but, in time of war, carry on mercantile negotiations and correspondence direct with *H. W.* at *London;* and one of them quits his country, during the war, for near a twelvemonth, and pays a personal visit to the counting house of *H. W.*, who was during all this time in great credit, and engaged in extensive speculations as a *London* merchant. The defendant had expressed a desire to withdraw from the partnership, as early as 1810; for in the letter of *H. W.* of the 18th of *January*, 1811, it is stated that a dissolution of the partnership could not be advertised in the *Gazette; according to the desire of the defendant.* It appeared by that letter, that the defendant had agreed, and probably as an alternative, to continue the partnership for two years, which would bring it to the 1st of *January*, 1813. Then it appears by the letter of *H. W.* of *January*, 1813, that he was about sending the dissolution of the partnership to the *Gazette*, and he adds, " that a proper line was struck in the books and cash, and that the defendant was no longer interested in any losses or profits on this side," meaning as to the business in *Europe.*

From this moment, it appears that *H. W.* went on in business by himself, and though he continued the name of *H. W. & Co.* we have no evidence that the defendant knew of it, or if he did, he had no power, during the war, to prevent it. A nephew of *H. W.*, who acted as his clerk, says, that

he had no knowledge that the defendant had any interest in the business, or derived any emolument from it. We have reason to presume that he had not, for there is no evidence of any further correspondence after *January,* 1813, between the two brothers. The war had interdicted all interference in each other's concerns; and if, when the partnership had ceased in fact, and according to the understanding of the parties, the defendants were to be held bound for the subsequent engagements of *H. W.* during the war, it would be a conclusion that must be drawn with pain and regret. The want of special notice of the dissolution, beyond what arose from the fact of the war itself, was not injurious to the plaintiffs; they had not, for years preceding, taken any notice of the defendant as a partner, and they dealt exclusively with the alien enemy abroad, and reposed, beyond all manner of doubt, entirely and with perfect satisfaction, upon his sole credit.

We are well warranted in drawing this inference from what appears in the present case. But these two plaintiffs were witnesses for *Seaman and others,* in the next cause against *Waddington,* and they can have no objection to our recollecting, while considering this cause, what they testified in that case.

One of them said, that he was in *London,* from *August,* 1813, to the spring of 1814, and was personally acquainted with *H. W.,* who was a resident merchant there; and in all that time he does not so much as say, that he ever asked the question, whether *H. & J. W.* were partners, or that he dealt with *H. W.* upon that ground; all he says, is, that they were reputed to be partners.

The other of the plaintiffs said, that, in 1810 or 1811, as he was about making a shipment to *Cadiz,* and wishing to invest the proceeds in a *London* house, he told the defendant, he would place them in the hands of *H. W.* if the defendant would be a guarantee for him, and he replied it was unnecessary, for he was a partner: this was in respect to a shipment a year or two before the war, and three or four years before the transactions on which this suit arose. And this is all the communication the plaintiffs ever pretended to have had with the defendant, though he *resided* in the

same city with them; and considering the occurrence of the great event of the war, years afterwards, and the pains that the plaintiffs took, and the hazard they run, to have personal dealings with *H. W.*, I feel well warranted to say, that the plaintiffs, during the year 1814, must have dealt with *H. W.* on his own credit.

But before we discuss the question touching the obligation of the defendant as a partner, we must determine whether the law will raise a promise, or permit the plaintiffs to recover upon an account stated with an alien enemy in war, and composed of commercial transactions had between them during the war. If I do not entirely deceive myself, it is settled, upon principles of public policy, and declared by the law of nations, by the law of *England*, and by the law of this country, that no such promise can be raised, and no such action can be sustained.

On the 18th of *June*, 1812, Congress by law declared, that war existed between the United Kingdom of *Great Britain* and *Ireland* and the *United States.* This was not a war confined to the two governments or bodies politic, in their political or corporate capacity. Every man is, in judgment of law, a party to the acts of his own government; and war existed between all the individuals of the one, and all the individuals of which the other nation was composed. Government is the representative of the wills of all the people. This is the theory in all governments, and the matter of fact in all free governments. The war was, therefore, declared by the united will of the people of the *United States*, and there can be no doubt of its being a moral, as well as a civil duty in every individual to obey the law. This is the sound and fundamental principle of civil government. Every *American* citizen and every *British* subject resident in their respective countries, became, by the declaration of war, enemies to each other; and the idea that any commercial intercourse or pacific dealing could lawfully subsist between them, without the clear and express sanction of the government, is utterly inconsistent with the new class of duties growing out of a state of war. The point would appear to rest on the obvious dictates of reason, as well as the plainest deductions of public policy. If individuals

could carry on a friendly intercourse while the government was at war, the act of government and the acts of individuals would be contradictory. The will of one or of a few would, as far as the example went, contravene the declared will of the whole. Such a principle is certainly the parent of disorder; it inculcates contempt of law; it throws obstacles in the way of the public efforts, and it contains within itself the germ of treason and rebellion.

But on a question of such grave and vital importance, I must beg the indulgence of the court, while I examine the authorities, in order to discover what are the correct opinions and decisions of the enlightened part of mankind.

"When the head of a state or sovereign declares war against another sovereign," says *Vattel,* (b. 3. c. 5. s. 70.) "it implies that the whole nation declares war against the other, as the sovereign represents the nation, and acts for the whole society. Thus these two nations are enemies, and all the subjects of the one are enemies to all the subjects of the other." He says again, (c. 15. s. 226, 227.) that, "If the law of nations be considered only in itself with regard to a rupture between two nations, all the subjects of the one may commit hostilities against those of the other, and do them all the harm authorized by a state of war." The declaration of war "actually authorizes, nay, even obliges all subjects, of whatever rank, to secure the persons and things belonging to the enemy when they fall into their hands."

The same consequence of a declaration of war is laid down by *Grotius,* (lib. 3. ch. 3. s. 9. and ch. 4. s. 8.) and by *Burlamaqui,* (part 4. ch. 4. s. 20.) who was a professor of law at *Geneva.* They both state, in so many words, that when war is declared against a sovereign, it is considered to be declared at the same time against all his subjects. * * *

It was said, during the argument of this case, that the act of congress declaring war only put the two governments, as bodies politic, at war, and that as it did not contain any express prohibition of individual intercourse and trade, none was to be implied. This opinion is certainly without any foundation. These great authorities on national law, concur in the doctrine, that a war on the part of the govern-

IN ERROR.
⋯⋯⋯
ALBANY,
January, 1819.
〰〰〰
GRISWOLD
v.
WADDINGTON.

ment, is a war on the part of all the individuals of which that government is composed  It must be so, from the nature of government and the obligations of law; and there is no colour or ground for the opposite sentiment, either in the language or practice of nations.

A formal declaration of war is not held necessary by the usage of *Europe*; and war may begin by mutual hostilities as well as by a declaration. (*Bynk. Q. J. Pub.* b. 1. c. 2.) Since the peace of *Versailles*, in 1763, formal declarations of war seem to have been disused in *Europe*, and all the necessary and legitimate consequences of war, flow at once from a state of public hostilities, duly recognized and explicitly announced.  In the war of 1756, between *England* and *France*, war was not formally declared, until *May* and *June*, 1756, though vigorous and active hostilities had been carried on, by sea and land, for a whole year preceding. When these formal and ceremonious declarations of war were made, they were only declaratory of the existing state of things; but they show most unequivocally what the *European* governments understood by a state of war.  Thus the declaration in 1756, on the part of his *Britannic* majesty, forbids his subjects to carry any contraband goods, such as soldiers, arms, ammunition, &c. to *France*, or to hold " any correspondence or communication with the *French* king or his subjects."  So the counter declaration, on the part of the king of *France*, enjoins all his subjects, vassals, and servants, to fall upon the subjects of the king of *England*, and he expressly prohibits " all communication, commerce and intelligence with them, upon pain of death."

These declarations were the *formulæ* which had been adopted in preceding wars, and were only acts declaratory of the laws of war.  They were given by way of monition to the subjects of the respective powers, and we might as well infer that it would have been lawful for a *British* subject to have transported soldiers and arms to *France*, if no such declaration had been made, as that it would have been lawful to have had communication and correspondence with the enemy, if the prohibition had not been expressly declared.

So, in the declaration of war by *England* against *Spain*,

IN ERROR.
........
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

in 1762, the king orders all acts of hostility against the king of *Spain*, his vassals and subjects, and forbids his subjects to hold "any correspondence and communication with the king of *Spain* and his subjects, and not to carry any soldiers, arms, ammunition, &c. to *Spain*." And in the counter declaration of the king of *Spain*, he declares war against the king of *England* and his subjects, and declares that his subjects must have "no dealings with those of *England*." As a further instance of the general sense of the *European* governments on the operation of war, we may refer to the declaration of war in 1762, by *France* against *Portugal*, in which the king commands all his subjects, vassals, and servants, to fall upon the subjects of the king of *Portugal*, and expressly prohibits them from having "any communication, commerce, or intelligence with them, on pain of death." And in the mutual declarations of war between *Spain* and *Portugal*, in 1762, *Spain* prohibits "all commerce with the *Portuguese*," and the king of *Portugal* orders his subjects, of whatever rank, quality, or condition they be, "to quit all communication and correspondence with their enemies, under the penalties decreed against rebels and traitors."

Since that period, declarations of war in the ancient solemn form, have been disused. In the war which commenced between *England* and *France*, in 1778, the first public act on the part of the *English* government, was the withdrawing of its minister from *France*, and that single act was declared by *France* to be the first breach of the peace. There was no other declaration of war; but each government published a manifesto to the world in vindication of its claims and conduct. The same thing may be said of the war which broke out in 1793, and which was renewed again in 1803. But though we have no formal declarations of war, as in former times, containing injunctions to subjects of one belligerent to fall upon the subjects of the other, and prohibiting all intercourse and correspondence between the subjects of the parties at war; yet it is equally true, that all intercourse and trade have been held as unlawful in these latter, as in any former wars. The argument, then, drawn from the practice of the *European* governments, appears to be conclu-

sive, that all intercourse and commerce between the sub-
jects of hostile states, has uniformly been held unlawful, and that the illegality resulted from the very act of war.

Public jurists hold the same language with these decla
rations of war.

*Grotius*, when treating of the obligations of good faith in war, (lib. 3. ch. 22. *de fide privata in Bello*,) alludes only to promises made by captives, or made under some pressing necessity created by the war; he had no reference to any voluntary intercourse or commerce with the enemy. He says expressly, (*ibid.* s. 5.) that private contracts with the enemy, touching private actions and things, are unlawful, and controled by the superior duty which the citizen owes to his own state. And *Gronovius*, one of his commentators, alluding to such contracts, says, that the citizen has no such ability to contract, *ob jus, quod in eos habet princeps vel civitas.*

*Puffendorf*, (lib. 8. ch. 7. s. 14.) from the example which he gives of the engagements of private individuals with the enemy, evidently confines the right, as *Grotius* does, to cases of necessary self-defence, or of necessity created by the war. And *Barbeyrac*, in his note to the passage, says, that private agreements between enemies are forbidden by the laws, and cannot be held valid, unless authorized by the consent of the state.

*Vattel*, also, (b. 3. c. 16. s. 264.) confines this right of individuals making contracts with the enemy, to cases of palpable necessity arising out of the war, as in the case of a ransom bill by a prisoner of war. An engagement to pay the price of a ransom bill seems to be almost the solitary instance in which a private contract with an enemy is allowable and valid by the law and usage of nations. This is indeed strictly a war contract, or one arising out of a state of hostility, and to this case the rule would seem to be applied, that good faith was to be observed with an enemy. (*Le Guidon*, ch. 6. art. 2. *Emerigon*, ch. 12. s. 21. 2 *Azuni*, b. 4. ch. 4. art. 6. *Goodrich* v. *Gordon*, 15 *Johns. Rep.* 6.)

And this appears to be all the indulgence allowed to private contracts between enemies in time of war. They are

IN ERROR.
........
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

anomalous cases founded on the war itself, and subservient to its operation. They do not apply to any sort of voluntary intercourse, and much less to any commercial correspondence, or private negotiation in the way of business. This will more fully appear by a further examination of other writers on public law.

One of the most distinguished of these writers is *Bynkershoeck*, whose treatise on *the law of war* (*De Rebus Bellicis*) has been more quoted and relied upon as an authority, in *Europe* and *America*, than that of any other writer. It has indeed suited the purpose of some of the counsel in this cause, to undervalue his authority, by showing that he laid down the rules of war to a cruel extent. But it is sufficient to observe, that he was laying down the strict rules of war as between enemies, while he at the same time condemned the severity of such rules. Every thing is lawful, as he observes, against an enemy, but nothing can be more cruel than to punish him for his courage. It is certainly noble, says he, to practise the duties of humanity, clemency, piety, and other magnanimous virtues, in the midst of war. The professor *Burlamaqui*, a writer of the most humane and moral principles, declares the strict rules of war with just as much severity as *Bynkershoeck*, and contends that we may use in war, frauds and artifice, as well as unlimited violence and force, and that these strict rights of war are controled, not by any limitation of the right itself, but by refinement of manners, and the principles of honour and humanity. (part 4. ch. 5.)

*Bynkershoeck* (*Quæst. Jur. Pub.* b. 1. c. 3.) declares, "that from the nature of the war itself, all commercial intercourse ceases between enemies. For what purpose would trade be carried on, if, as is clearly the case, the goods of enemies brought into our country, are liable to confiscation? But all commercial intercourse must cease, and in declarations of war this mutual commerce is interdicted, and it is often done by subsequent edicts. But although there be no special prohibition of trading with the enemy, yet it is forbidden by the very right or laws of war. Sometimes," he continues, "a mutual commerce is permitted generally, sometimes, as to certain merchandize only, and

sometimes, it is prohibited altogether.  But in whatever
manner it may be permitted, whether generally or specially,
it is always, so far, a suspension of the war; and we have
partly a state of war and partly a state of peace between
the subjects of the two states."

IN ERROR. ·

ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

*Heineccius*, the professor of law at *Halle*, was one of the
most distinguished civilians that *Germany* has produced.
He speaks of *Bynkershoeck* in exalted terms, and says, that
his merits were equally great in the republic of letters and
in that of his country.  He declares, also, explicitly, in his
treatise *de jure principis circa commerciorum libertatem tuen-
dam*, s. 12. (*Opera*, tom. 2. part 2. 98.) that all commerce
ceases, of course, with the enemy ; nor can it truly be per-
mitted that we should enter into negotiations with those with
whom we are at war, since there can be no safe intercourse
between each other, and we hazard personal captivity and
confiscation of property, in the very attempt.  (*Quod ad
hostes attinet, cum iis omne cessare solet commercium, nec
fieri profecto potest, ut cum illis negotiemur, quibuscum
bellum gerimus, quum nec illis ad nos, nec nobis ad illos tu-
tus accessus sit ; et personis captivitas, rebus publicatio im-
minent, si in hostico deprehendantur.*)

If we proceed to *French* and *Spanish* authorities, on the
subject of intercourse and trade with an enemy in time of
war, we shall meet with the same language.

Dr. *Robinson* in his note to the case of the *Cosmopolite*,
(4 *Rob. Adm. Rep.* 10.) refers to *Boerius*, who was president
of the parliament of *Bordeaux*, in the early part of the six-
teenth century, and who records the concurrent testimony of
several *European* states, as to the practice of restraining com-
mercial intercourse with an enemy.  He declares it to be
the general opinion of jurists, that all kind of commerce
with the enemy in time of war was unlawful—*non licet,
tam licitas, quam illicitas hostibus deferre, tempore guerræ.*

In the *French* treatise, *Le Guidon*, (ch. 2. s. 5.) it is
declared, that the subjects of the king cannot lend or put
their names to any insurance of property belonging to his
enemies ; and this article of the *Guidon*, says *Cleirac*, (*Us
et Coutumes*, p. 197.) is conformable to the ordinances of
*Barcelona* of the year 1484.  We find those *Spanish* ordi-

nances inserted at the end of the *Consolato del Mare*, (*Consulat de la Mer, par Boucher*, s. 1540.) where it is declared, that if the cargo of a ship belong, in whole or in part, to enemies of the king, it cannot be assured directly, or indirectly, at *Barcelona*. And *Cleirac*, (*ibid.*) who published his work as early as 1671, says, that of right it is not permitted to confer or to negotiate with the enemies of the state. Nothing can be more comprehensive, or stronger than the general interdiction which he lays down on this subject, (*De Droit, il n'est pas permis de conferer, ou de negocier avec les ennemis de l'estat,*) and he refers to the civil law, (Dig. 39. 5. 11.) which makes it a capital offence to sell articles of necessity to the enemy, and to the *French* ordinances of the years 1543 and 1584, which prohibit absolutely all commerce, direct or indirect, with the enemy.

*Valin,* in his commentaries on the ordinance of the marine, (liv. 3. tit. 6. art. 3.) declares, that every declaration of war imports always an interdiction of commerce between the subjects of the king and the enemies of the state, whether the trade be attempted in national or in neutral vessels. This interdiction of trade with the enemy, he says, as being a matter prejudicial to the state, includes in it also of clear right, a prohibition to insure enemy property; for, to insure the goods of the enemy, or to send them to him, directly or indirectly, amounts to the same thing. He refers also to the ancient ordinances which had been cited by *Cleirac;* and he says, in another place, (liv. 3. t. 9. art. 7.) that all communication of the subjects of the king with the enemy, is strictly forbidden, under pain of death.

*Emerigon* (tom. 1. 128.) considers these inhibitions of insurance of enemy property as only a consequence of the interdiction of commerce contained in the *formula* of the declarations of war; and he says, that in the war of 1756, the insurance of *English* property was held in the *French* courts to be null and void; yet both he and *Valin* observe, with a degree of surprise, that *English* insurances of *French* property were continued. I shall have occasion, presently, to show that these *English* insurances were never judicially recognized as lawful; and it cannot but excite our

astonishment that such insurances were ever hazarded, after the *English* declaration of war in 1756, which (as we have already seen) prohibited "all correspondence or communication with the *French* king, or his subjects." After this, it would appear to have been perfectly idle to talk of the legality of such insurances.

IN ERROR.
••••••••
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

[ The *Swedish* commercial ordinances of 1750, (2 *Magens*, 256.) not only declared all insurances of enemy property void, but prohibited the same under a heavy penalty. And, indeed, the reason of war, as *Bynkershoeck* observes, (Q. J. Pub. 1. ch. 21.) absolutely requires this prohibition; for what else is it, says he, than promoting the maritime commerce of the enemy. His observations and those of *Valin* entirely agree, and are conclusive on this point: the object of insurance is, that maritime trade may be carried on with the greatest profit, and with the least loss, and therefore these insurances are, on every principle, to be prohibited; nothing is more directly in opposition to the laws of war. (*Id autem adversari belli legibus, plusquam manifestum est.*) *Bynkershoeck* says, that it would require an uninterrupted series of judicial decisions to confirm such a usage, and that the States-General of the *United Netherlands* acted in conformity to the *jus belli*, when, by an edict of 1657, they prohibited the insurance of the goods of the *Portuguese*, with whom they were at war, and when they issued a similar edict, in regard to *England*, in 1665, and in regard to *France*, in 1689, with whom they were at war at those respective periods.]

It may be proper here to pause for a moment, and consider what has hitherto been shown : We have been reviewing the opinions of the most eminent jurists, and the usages of the most distinguished continental nations of *Europe*, touching the lawfulness of any commerce or communication with the enemy in time of war. Our researches, hitherto, have been confined to the *European* continent; we have not scarcely placed even a foot on *British* ground; and yet we see that the highest authorities on the law of nations, *Grotius*, *Puffendorf*, *Burlamaqui*, *Vattel*, *Bynkershoeck*, and *Heineccius*, and a series of more subordinate and local opinions, such as those of *Boerius*, *Cleirac*, *Valin*, and *Emeri-*

IN ERROR.
.......
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

*gon,* and the maritime ordinances of *Spain, France, Holland* and *Sweden,* unitedly prove, that all private communication and commerce with an enemy in time of war, are unlawful, and that, by the mere fact and force of the declaration of war, all the subjects of the one state are placed in direct hostility to all the subjects of the other. If any private negotiation or contract whatever be admissible, we have seen it can only be in cases of necessity, as in the case of ransom bills, which are indeed acts of intercourse, but such as are engendered by the laws and violence of war.

We come now to look into the decisions of the maritime and of the common law of *England;* and, independent of our very close concern with that system of jurisprudence, it cannot but be interesting to learn its maxims and policy on the question of commercial intercouse with an enemy in time of war. If any nation truly understands and wisely pursues the interests of commerce, it must be *Great Britain.* Her commercial character began to display itself to the admiration of *Europe,* as early as the reign of Queen *Elizabeth,* who was styled by her contemporaries, the restorer of naval glory and the mistress of the ocean. Since that time the nation, by her commerce, her arts, and freedom, has gradually risen to the highest pitch of grandeur and power. She seems almost to have realized the truth of that great maxim, as it is termed by *Huet,* and with which *Themistocles* and other statesmen of antiquity were deeply impressed, that the power which was master of the sea was master of the world. (*Hist. du Commerce et de la Navig. des Anciens, par M. Huet,* p. 92.) And if her rules of war on the subject before us are the same as those of the nations on the continent, we can have no better evidence of their sound policy, and no higher sanction afforded to their authority.

The most ancient case on the subject which is cited in the *English* law, is the direction contained in *the Black Book of the Admiralty,* that inquiry be had or inquisition taken of all persons who intercommune, sell, or buy, with any of the enemies of the king, without the special license of the king. (*Item soit enquis de tous ceux, qui entrecommunent, vendent ou achetent avec aucuns des enemis de notre seigneur*

*Le Roi, sans license especiale du Roi, ou de son admiral.* (1 *Rought.* art. 3. and note.) This book is a curious and venerable monument of antiquity, and it is frequently appealed to by the *English* Judges in the Admiralty, as an authority. Mr. *Selden*, in his notes to *Fortescue*, (*De Laud. Leg. Ang.* ch. 32.) says, a MS. copy of it, translated into *Latin* by *Roughton*, was communicated to him by Sir *Walter Raleigh*, and he supposes it cannot be ancienter than the reign of *Hen.* VI. though Sir *Leoline Jenkins* says, it is certainly prior to the reign of *Edw.* III. It is to me evidence, that any communion or personal intercourse with the enemy, without the king's license, was, in the time of *Edw.* II. and III., unlawful. In confirmation of this, we have the case at common law of 13 *E.* II. *B. R. Rol.* 12. (cited in 2 *Roll. Abr.* 173. pl. 3.) in which it is stated that the Keepers of the *Truce* gave license to certain men to sell and buy their goods in *Scotland*, which was then at war with *England*, and the merchants on this account were impleaded, and though the license was held void, yet they were pardoned by the king.

These two ancient and contemporary cases taken from the different courts, mutually reflect light upon, and add strength to each other.

We meet with scarcely any thing on the subject in the books after this period, (though *Brian*, J. is made to say in 19 *E.* IV. *Bro. Abr. tit. Den. et Allien pl.* 20. that an obligation made to the enemy of the king is void) until we come down to the latter end of the reign of king *Charles* II., when the case of the *East India Company* v. *Sandys*, was discussed in the K. B. in the most learned and elaborate manner. The case is very fully reported in the 7th volume of the *State Trials*, (p. 493. 2 *Show.* 366. S. C.) and though the point directly discussed and decided, was concerning the validity of the *East India Company Charter*, as a mercantile monopoly, the right of the subject to trade with alien friends and alien enemies was incidentally, but fully, considered. The counsel engaged in that cause were very eminent men, and some of them, after the period of the *English* revolution, added lustre and dignity to *Westminster Hall*. It was a point universally conceded by them all, that every kind

IN ERROR.

. . . . . . .

ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

of trading with an enemy in time of war was unlawful. Mr. *Holt*, (afterwards Lord Ch. J.) contended that no subject, by the law of the land, could lawfully trade with the subjects of the *Great Mogul*, without the king's license, because they were infidels, and all infidels were to be adjudged enemies. Mr. *Finch*, took the same ground ; and we have no further concern with their argument, than to show that they assume as the basis of it, that if the subjects of the *Mogul* were enemies, the defendant could not trade with them without a special license. Mr. *Pollexfen*, (afterwards Lord Ch. J.) asserted that " all contracts and dealings with alien enemies were absolutely void, for that they were not capable of making any contract." The words of the attorney general, Sir *Robert Sawyer*, are peculiarly strong and precise : " Having considered of foreign trade with aliens in amity, I proceed, (he observes,) to consider what the law determines of trade and commerce with alien enemies. Here the consideration is far different from what it was in the former case; in that the common law was silent, until an express prohibition by the king. *But here the common law is a prohibition of itself, and is at open war with alien enemies ;* whether, (he continues,) the commerce with alien enemies without license, be within the extent of aiding and comforting the king's enemies, within the stat. of 25 *E.* III. I shall not at this time argue ; but it may be worth while for the interlopers who traffick into foreign nations, not in amity with the king, without license, well to consider that point. Before the statute, *at common law, it was criminal.*" " But, (he concludes,) I need not labour so clear a point which was not opposed by the defendant's counsel, but their endeavor was to except infidels from being enemies."

The case of 7 *E.* IV. fol. 13. was cited and admitted to be good law, that after war was declared, any subject might seize the persons and goods of alien enemies who were without safe conduct, wherever he could find them ; and this was said to be the law of all nations.

Not one of the counsel in the cause denied, but all conceded, that the law forbade all trade and commerce with the enemy in war ; and the Ch. J. in the very learned opinion which he pronounced, declared that *eo ipso* that war was

proclaimed, all public commerce with the enemy was pro-
hibited, and that the declaration of war was, of itself, a pro-
hibition to all the subjects, not to have any commerce or trade
with the enemy. Nay, he said, it was *penal* for any of the
king's subjects to trade with alien enemies, without a royal
license.

This great and interesting case, which I have thus particu-
larly marked, as containing a clear and declared sense of
the common law, was decided in 1684; and we can have no
difficulty after this, in giving full faith and credit to note
which Lord *Mansfield* said, (*Gist* v. *Mason*, 1 *Term Rep.* 84.)
was given to him by Lord *Hardwicke*, of a reference, in king
*William's* time, to all the judges, whether it was a crime at
the common law to carry corn to the enemy in time of war,
and that they were of opinion it was a misdemeanor. *Holt*
and *Pollexfen*, who were counsel in the case I have just cited,
were probably upon the bench as judges, when that refer-
ence was made.

By the marine law, trading with the enemy without a royal
license, has uniformly been adjudged cause of confiscation
of the property; and we have a series of decisions in the
*English* admiralty on this point, from the year 1707, down to
this day. (*Vide* the cases cited by Sir *Wm.* *Scott*, in the case
of the *Hoop*, 1 *Rob.* 165. and by Sir *John Nicholl*, in his
argument in the case of *Potts* v. *Bell*, 8 *Term Rep.* 548.) I will
select only a few of them, showing the vigour of the rule in
the maritime courts, and the extent to which it is carried.

In the case of the *St. Philip*, decided at the *Cockpit*, in
1747, at which the Lord Ch. J. of the C. B. was present,
the Lords not only declared the rule, that trading with an
enemy was subject of confiscation, but they refused to give
the claimants liberty to prove that the goods which had been
captured and condemned, were bought before the war.
And in *Escott's* case, decided in 1781, it appeared that be-
fore the war, *Escott* had an established house of trade in
*Spain*, and had resided there for several years, until his re-
turn to *England*, when the war broke out; that the cargo
in question belonging to his house, had been left in *Spain*,
until a favourable opportunity offered of sending it to *London*.

IN ERROR.
•••••••
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

It was shipped on board a neutral ship and captured and condemned ; this was no more than an attempt in an *Englishman,* to remove from the enemy's country his property acquired before the war; yet his claim was rejected by a court at which was present Lord *Loughborough,* the Ch. J. of the C. B. In the argument which was sanctioned by the Court of Appeals in this case, (*vide* 1 *Bos. & Pull.* 350. *note*) it was declared, that after actual hostilities between two states, all trade and intercourse between the subjects of those states were illegal, even though no express prohibition of trade should be issued ; because, every subject is, by virtue of his allegiance, obliged to assist his king and distress the enemy, to the utmost of his abilities, and not to aid or assist them, either by trade or otherwise ; and that if *British* merchants were permitted, in time of war, to import goods from the enemy's country, under a pretence that the articles imported were their property, and deposited in their warehouses prior to hostilities, it would be a cover to a continued trade, and operate to an alarming degree. The case of the *Compte de Wohronzoff,* or the *Irish* case, was decided by the Lords of Appeal, in 1781. That was the case of the importation of *French* wines from *Bourdeaux,* under the idea that the government had recognized the legality of the traffick ; and the evidence of that recognition was infinitely stronger than the inferences to be drawn from the implied admission of the remission of bills by the cartel ships in the present case. It was stated in that case, that the commissioners of the revenue and excise in *Ireland,* had constantly and openly permited such a trade to be carried on from *Bourdeaux* to *Dublin,* in the same manner as before hostilities, and that the *Irish* legislature, by laying an additional duty during the war on *French* wines imported between 1780 and 1781, must have indirectly sanctioned the trade, as they could not have intended to draw a revenue from an illegal trade. But notwithstanding this very plausable defence, the condemnation was affirmed, and Lord *Loughborough,* Ch. J. of the C. P. was present.

The case of the *Bella Guidita,* or the *Grenada* case, decided in 1785, had very pressing claims upon a relaxation of the rules of war ; the question was, whether it was so

unlawful in a *British* subject to send supplies to the *British*  IN ERROR.<br>·······<br>ALBANY,<br>January, 1819.
plantations in the *Grenada* islands, whilst under the misfor-
tune of a temporary subjection to the *French*, as that a con-
fiscation of the property was a consequence of the miscon-
duct; and notwithstanding, it was urged that the proprie-  GRISWOLD<br>v.<br>WADDINGTON.
tors in those islands were still *British* in principle and af-
fection, and that those islands would be condemned to ab-
solute sterility by a refusal of such necessary supplies, yet
the condemnation of the cargo, as *French* property, was
affirmed.

When war is announced, it arrests, *eo instanti*, all com-
mercial intercourse; thus in the case of the *Elnigheid*,
decided in 1795, corn had been shipped by a *British* and
*Dutch* house, from *Rotterdam* to *Nantes*, in *December*, 1792,
before hostilities had broken out between *France* and *En-
gland*. The ship had been prevented, by various accidental
causes, from putting to sea until the 9th of *February*, 1793,
and on the 1st of *February*, war had been declared against
*England* and *Holland*, by *France*; the cargo was held to
be lawfully condemned, and several of the judges at law,
were present; yet it is a remarkable fact, that this vessel
sailed from *Holland* for *France*, on the 9th of *February*, with
a cargo actually laden in time of peace, and it was not un-
til the 11th of *February*, (or two days after,) that the king
first announced, by message to parliament, that the persons
exercising the powers of government in *France* had actually
declared war against his majesty, and the *United Provinces*.
It would be impossible to cite a case in which the rule of
war punishing all attempts at trade, or intercourse with an
enemy, has been more strictly and severely applied.

I will notice, for the present, but one case more of these
decisions of the Lords of the Admiralty, upon appeal. In
the case of *The William*, decided in 1795, the claimants
were *British* merchants residing in *Grenada*. They had
debts owing to them from *French* merchants in *Guadaloupe*,
and which had been contracted prior to the war, and the
sugars in question had been received in payment by the
agent of the claimants, and shipped. But such a remit-
tance even from the enemy, and for such a purpose, was
held unlawful; and it was urged, that the allowing of a com-

IN ERROR.

ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

* *Ante,* p. 327.

merce with the enemy, even for the specious purpose of withdrawing property, without a previous license, would be opening the door to treasonable communications.

These cases which I have enumerated, were decided, it is true, in the admiralty courts, and under the sanction of the maritime law; but can there be any material distinction, on the rights and duties of the subject, between the marine law, and the common law of the land? We have seen, that the most distinguished judges of the courts of common law, formed a part of the court of the Lords Commissioners on appeal. The marine law, and the common law, are derived from the same source, and supported by the same authority. They are distinct parts of one system, diversified as to the mode of proof, and the nature of the relief, but agreeing in the same principles of right, and maxims of policy. Prize cases founded on illegal intercourse, naturally belong to the admiralty, and are appropriated to that jurisdiction, as was lately decided by this court in *Novion* v. *Hallett.** The courts of common law will rarely have occasion to pronounce on the case of illicit intercourse with the enemy, except when contracts founded on such intercourse, are attempted to be enforced, or when the party is called to answer personally for his misconduct. But when the oracles of the common law have been appealed to, they have always spoken in a harsh tone, and with clear and decided language. This appears in the case from *Rolle*, of trading with the *Scots*, who were then enemies; in the opinion of the judges in King *William's* time; and in the language of the bar and bench, in the great case of the *East India Company* v. *Sandys*. All such contracts and dealings, are declared to be utterly void; all such intercourse to be penal or criminal. In the emphatical language of Sir *Robert Sawyer*, the common law is at open war with alien enemies; and with the exception of merchants who were found in the realm at the beginning of the war, and were under the protection of *magna charta*, it seemed to be every where conceded in that great case, that any one might seize alien enemies and their effects, wherever they could be found.

The admiralty inflicts all the punishment in its power, when it decrees a confiscation of the goods. This was so

held by the Commissioners on appeal, in the case of *The*
*Elizabeth of Ostend,* in 1749, when they decided, in so many
words, that *a British subject cannot trade with the enemy;*
and two judges of the K. B., and that great statesman the
elder *Pitt,* were present at this decision.

From the admiralty, we will recur again to the courts of
common law, and pursue the train of their decisions.
The observations of Lord Ch. *Hardwicke,* in the case of
*Henkle* v. *The Royal Exchange Assurance Company,* (1 *Vesey,*
317.) have been thought favourable to some partial and
undefined intercourse between the subjects of hostile states.

It was the case of a bill to correct a mistake in a policy
on a ship from *London* to *Ostend,* and to the *Canaries,* and
the objection was, that it was an illegal trade to an enemy's
port in time of war. The words of the chancellor were,
" that no determination has been, that insurance on enemy's
ships during the war was unlawful. It might be going too
far to say, all trading with enemies is unlawful, for that ge-
neral doctrine would go a great way, even where only *En-
glish* goods were exported, and none of the enemy's im-
ported, which may be very beneficial. I do not go on a
foundation of that kind, and there have been several insu-
rances of this sort during the war, which a determination
upon that point might hurt. As to insurance on wool, tran-
sported to *France,* I never doubted but that was an unlawful
contract."

These loose, and almost unmeaning observations were
made in *November,* 1749. The chancellor refused to amend
the policy. It appeared that there had been a loss by capture,
and it is probable this was the very case of the ship *Eliza-
beth of Ostend,* owned by a person of the same name, *Hen-
kle,* and where the Court of Appeals, consisting among
others, of Mr. *Pitt,* and two judges of the K. B., had, a
few months before, affirmed the capture and condemna-
tion, on the declared ground, that a *British* subject could
not trade with the enemy. Surely these idle doubts (for
they are nothing more,) of Lord *Hardwicke,* are not entitled
to the least consideration, after such a solemn judicial de-
cision in the month of *January* preceding. And, indeed,
Sir *John Nicholl,* speaking from a MS. note of this very

case, (cited in *Potts* v. *Bell*, 8 *Term Rep.* 556.) says, that Lord *Mansfield*, who was then solicitor general, (and who, probably, communicated to Lord *Hardwicke* all his embarrassments and doubt, about the insurance of enemy property,) admitted in argument, that any trading with an enemy was a misdemeanor, and that by the maritime law, it was a cause of confiscation.

When Lord *Mansfield* considered any trading with the enemy a misdemeanor, he had reference to the doctrine of the common law, and we may be perfectly assured he never could have held any insurance of enemy property to be lawful, however advisable he might deem such contracts, on the ground of expediency and policy. To insure enemy property, is a species of trade and intercourse with the enemy, and both *Valin* and *Bynkershoeck*, (as we have already seen,) agree that it is an indirect mode of promoting the enemy's commerce.

The case of *Ricord* v. *Bettenham*, (1 *Wm. Blacks.* 563. 3 *Burr.* 1734.) was in the K. B. in the year 1765, and arose on a ransom bill taken in the preceding war; and I notice the case here, only for the language of the counsel, which is proof how the law was understood at that day. Mr. *Dunning* asserted, that the subjects of hostile states were incapable of contracting in time of war, and that no action would lie on such a contract. Mr. *Chambers* seemed to concede, on the other side, that all civil and commercial contracts in time of war, were bad, but undertook to show, that a ransom bill was not an illegal contract, for that it could only take place between declared enemies.

In *Brandon* v. *Nesbit*, (6 *Term Rep.* 23.) the suit was on a policy of insurance, brought in the name of an *English* agent, for his principal, who was an alien enemy, and the K. B. decided, that no action could be maintained, either by, or in favour of an alien enemy.

This case was considered as giving a fatal wound to the opinion which had crept in, (though without any authority for it,) that the insurance of enemy's property was legal. If no suit could be brought in favour, or for the benefit of the alien enemy on such a policy, it was idle to talk of its legality. In *Bristow* v. *Towers*, (6 *Term Rep.* 35.) which

was decided immediately afterwards, the insurance was declared to be on goods warranted *French* property, from *London* to *Dunkirk*, in a neutral ship. The question on the legality and policy of such insurances was discussed very much at large, and with great ability and learning. There was no plea of alien enemy, and the decision of the court was upon the strict ground, that the insurance of enemy's property was illegal. It was admitted by the counsel for the plaintiff, that there was no case in point, in support of the validity of such insurances, and the argument on the other side was urged by Mr. *Park*, (now one of the judges of the K. B.) with conclusive, and irresistible effect. He truly observed, that the statutes of 21 *Geo.* II. and 33 *Geo.* III., against such insurances, were merely accumulative of penalties, by annexing forfeitures and imprisonment to the common law prohibition of such transgression, and that such a species of traffick made bad subjects, by setting their interest on the side of the enemy. The general law of the land never could tolerate a practice which might lead the subject into so strong a temptation to betray his duty, and the utmost that all the previous cases amounted to, was an opinion in favour of the expediency of permitting such insurances in time of war.

The case of *Bell* v. *Gilson*, (1 *Bos. & Pull.* 345.) decided a few years afterwards in the C. B. held, that the insurance of goods purchased in an enemy's country, during war, by a *British* agent, and shipped for *British* subjects, was a lawful insurance. The judges undertook to take this case out of the general rule, and to consider it not an insurance on enemy's property, and they did not mean to decide that it was lawful to traffick during war with the enemy's country. But the case was evidently carried too far, and was subsequently overruled. The leaning of the court was to allow the subject to bring home his property from the enemy's country, after the war had commenced, which had been before, and which has been since held unlawful, without license from the government. This case, however, is deserving of notice for what Mr. J. *Buller* says of Lord *Mansfield's* opinion. " On the legality of insurances of enemy's property, I never," says he, " could get Lord *Mansfield* to reason.

He never went beyond the ground of expedience, and thought it for the interest of the country to insure enemy's property. The illegality of such underwriting, is now pretty well settled."

In the year 1800, the case of *Potts v. Bell*, (8 *Term Rep* 548.) was brought to an argument and decision in the K. B., and it put an end, for ever, to any question at law, as to the legality of trading with the enemy in time of war.

That case was an insurance on the conveyance of goods purchased in an enemy's country, from *Holland* to *England*, and it was decided, that trading with the enemy, without the king's license was illegal. It was held to be illegal for a subject in time of war, without license, to bring, even in a neutral ship, from an enemy's port, goods which were purchased by his agent resident in the enemy's country after the commencement of hostilities.

The counsel for the insurers, upon the first argument, was *Gibbs*, afterwards Chief Justice of the C. B., and he laid down the general doctrine, that by the common law, all trading with the enemy was unlawful, and had always been held so, from the mischievous consequences which ensued from it, and that the practice, from the earliest times, of granting licenses by the crown for such an intercourse in particular cases, was evidence of the general rule. Not a judicial decision to the contrary was produced on the other side; but on the second argument, Sir *John Nicholl*, the king's advocate, brought into the case the whole series of admiralty decisions, and traced them down from the beginning of the last century. He shed that superior light and learning upon the cause which were to be derived from the greater experience and more enlarged views of the civilians of the admiralty, on these topics of public and international law. He contended, that trading with the enemy, was not only illegal, but that the contract of insurance must be equally illegal, for it is an indemnity against the risks attending on such trading. War puts every individual of the respective governments, as well as the governments themselves, into a state of hostility with each other. There is no such thing as a war for arms and a peace for commerce. Trading supposes the existence of civil contracts and relations, and is,

therefore, contradictory to a state of war. It is criminal in
a subject to aid and comfort the enemy, and it belongs to the
state alone to balance the evils and the benefits of trade,
and to grant licenses to particular persons when the exi-
gency of circumstances may require it.

This argument carried conviction to the understanding of
the court, and Lord *Kenyon* said, that the reasons and autho-
rities were so many, so uniform, and conclusive, to show
that trading with the enemy without the king's license was
illegal, that the question might be considered as finally at
rest, and that this was a principle of the common law.

The same point arose, afterwards, in other shapes, before
the *English* courts of common law, and the same doctrine
was uniformly declared.

Thus, in the case of *Furtado* v. *Rodgers*, (3 *Bos. & Pull.*
191.) there was an insurance on *French* property previous
to the war, and even that was held not to cover a loss
by *British* capture, after the war was renewed. Lord
*Alvanley*, in delivering the judgment of the court, said, that
an insurance of enemy's property, as well as all commercial
intercourse with the enemy, was, at common law, unlawful,
and that an insurance, though effected before the war, made
no difference, as a foreigner might otherwise insure previous
to the war against all the evils incident to war. He said,
that insurances of enemy's property had been indulged, but
never were legal, and were never decided to be legal. And
in the case of *Kellner* v. *Le Mesurier*, (4 *East Rep.* 396.)
the late Lord Chief Justice, *Ellenborough*, held, that these
insurances were not only illegal and void, but repugnant to
every principle of public policy, and that the former opinion
in favour of the expediency of such insurances had never
yet produced one single judicial determination in favour of
their legality.

Here we have, then, a series of decisions at law touching
the lawfulness of any commercial intercourse with an ene-
my, in which the language of the courts appears to have
been consistent and decided; and the question to have been
as clearly, uniformly, and incontrovertibly settled, as we
can possibly expect in any case, and from any human tri-
bunals.

VOL. XVI. 60

IN ERROR.
......
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

We will now cast an eye, once more, upon the decisions of the courts of admiralty, which, it will be recollected, we have already followed down to the year 1796. The maritime law and the common law had hitherto proceeded with equal steps, and in perfect harmony on this interesting question. In 1798, Sir *Wm. Scott* was appointed judge of the High Court of Admiralty, and from the uncommon talent and learning, as well as purity and taste, so conspicuous in his decisions, that court excited a great share of public attention; and dealing chiefly with questions of universal concern, it spread the judicial character of the *English* throughout the civilized world. Judging from the decisions of the Supreme Court of the *United States*, I should say, that the authority of that eminent judge stood as high at *Washington*, as it does at *Westminster;* and there is scarcely a decision of his on the general principles of national law, but what has been adopted by the federal courts, even during the heat and tumult of the late war.

In the case of *The Hoop*, in the year 1799, ( 1 *Rob.* 196 ) Sir *Wm. Scott* discussed, at large, the question before us, and reviewed all the authorities, and adverted to the leading principles of reason and policy. He declared, that there existed a general rule in the maritime jurisprudence of the country, by which all trading with the public enemy, unless with the permission of the sovereign, was interdicted, and he showed, that this was a general principle of law in most of the countries of *Europe*. The sovereign who has the power of entirely removing the state of war, has the power of removing it in part, by permitting where he sees proper, *that* commercial intercourse which is a partial suspension of war. There may be occasions in which such an intercourse may be highly expedient. But it is not for individuals to determine on the expediency of such occasions. It is the state alone, on more enlarged views of policy, and of all the circumstances that may be connected with such an intercourse, to determine when it shall be permitted, and under what regulations. No principle ought to be held more sacred than that this intercourse cannot subsist on any other footing than that of the direct permission of the state. Who can be insensible to the consequences that might follow, if

every person in time of war had a right to carry on a com- IN ERROR.
••••••
ALBANY,
January, 1819.
⌣⌣⌣
GRISWOLD
v.
WADDINGTON.
mercial intercourse with the enemy, and, under colour of
that, had the means of carrying on any other species of in-
tercourse he might think fit?    The inconvenience to the
public might be extreme.    Another principle of law of a
less politic nature, but equally general in its reception, and
direct in its application, forbids this sort of communication ;
and that is the total inability of an enemy to enforce any
such contract by suit.    In the law of almost every country,
the character of alien enemy carries with it a disability to
sue, or to sustain, in the language of the civilians, a *persona
standi in judicio*.    Even in the case of ransoms, which are
contracts arising *ex jure belli*, and tolerated as such, the ene-
my cannot sue in his own name, and the payment must be
enforced by an action brought by the hostage.    A state of
things in which contracts cannot be enforced, cannot be a
state of legal commerce.    If the parties who are to con-
tract have no right to compel the performance of the con-
tract, nor even to appear in a court of justice for that pur-
pose, can there be a stronger proof that the law imposes a
legal disability to contract?    To such transactions it gives
no sanction ; they have no legal existence ; and the whole
of such commerce is attempted without its protection and
against its authority.    The legality of commerce, and the
mutual use of courts of justice, must be inseparable.

By such plain, clear, and, as it appears to me, masterly
reasoning, did Sir *William Scott* overthrow the notion of
any admissible trade with the enemy, without the authentic
and special license of the king.    The rule, he continues to
say, is so firmly established, that no one case exists which
has been permitted to controvene it.    All cases of that kind
which have come before the Supreme Court of Appeals,
have received a uniform determination.    The cases prove
that the rule has been rigidly enforced, even where strong
claims, not merely of convenience, but of necessity, excus-
ed it, on behalf of the individual.    It is difficult to conceive
that the common law of *England* can, by any possibility, be
otherwise, for the rule, in no degree, arises from the trans-
action being upon the water, but from principles of pub-
lic policy, and public law, which are just as weighty on

IN ERROR.
••••••
ALBANY.
January, 1819.
GRISWOLD
v.
WADDINGTON.

the one element as on the other.   The court has no power to depart from the law on this subject, on considerations of compassion, or of the utility of the particular commerce.   The property engaged in such commerce is subjected to forfeiture ; and the rule was unbendingly applied in this very case of *The Hoop*, though the articles imported from *Holland* were of essential use in manufactures, and were imported under an assurance from the commissioners of the customs in *Scotland*, that they might be lawfully imported without license, under the statute of 35 *Geo.* III. Sir *William Scott* said he felt greatly for the individuals, who, he had reason to presume, acted ignorantly, under advice that they thought safe ; but the court had no power to depart from the law which had been laid down.

I can only add, upon the conclusion of that decision, that any court of justice that can expound the law with such admirable perspicuity, and maintain it with such intrepid firmness, in spite of all personal feelings, and of the hardships and compassion of the case, must impart honour to the country in which it is instituted, as well as command the confidence and esteem of the rest of mankind.

Without dwelling particularly upon any more of these admiralty cases, I shall content myself with taking notice of those remarks of Sir *William Scott*, in other cases, which appear to be strong and pertinent.

Thus in the case of *The Odin*, (1 *Rob.* 248.) he said there was no maxim better, or more firmly established, in the maritime law of that country, than that no subject could trade directly, with the public enemy, but under a license authorizing him so to do ; and, in the case of the *Cosmopolite*, (4 *Rob.* 8.) he said it was perfectly well known that by war " all communication" between the subjects of the belligerent countries must be suspended, and that " no intercourse" can legally be carried on between the subjects of the hostile states, but by the special license of their respective governments.   So, again, in the case of the *Neptunus*, (6 *Rob.* 403.) he observed, that a declaration of hostilities naturally carries with it an interdiciton of all commercial intercourse. It was the natural result of a state of war, and it was not necessary that there should be a special interdiction of commerce to produce that effect.   And, again, in the *Goede Hoop*,

(1 *Edw. Adm. Rep.* 328.) he declared that " a state of war was a state of interdiction of communication." It was a law not peculiar to that country, but one which obtained very generally among the states of *Europe.*

IN ERROR.
••••••
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

There are only one or two more cases in the *English* courts of common law that require our attention.

In the case *Ex parte Boussmaker*, (13 *Vesey*, 71.) Lord Chancellor *Erskine*, having occasion to notice this subject, observed, " that a debt arising from a contract with an alien enemy could not possibly stand, for the contract would be void. But if the two nations were at peace at the date of the contract, it being originally good, upon the return of peace, the right to sue would survive." The chancellor here very clearly and accurately marks the distinction between debts contracted before and after the commencement of the war ; and he holds the latter to be absolutely void.

In *Antoine* v. *Morshead*, (6 *Taunt.* 237.) the court of C. B. carried the allowance of a contract with an enemy to a considerable length ; but it was a case of necessity created by the war, being a bill drawn by a *British* prisoner in *France*, on his son in *England*, for subsistence. The bill was drawn in favour of another prisoner, and endorsed to an alien enemy, who was allowed to recover on the bill after the return of peace. The case was declared to be an exception to the general rule, and to be founded on the extreme necessity of affording subsistence to a prisoner of war. It has nothing to do with voluntary intercourse in the way of mercantile negotiation and trade. The case of *Willison* v. *Patteson and others*, (7 *Taunt.* 439. 1 *Moore*, 133. S. C.) is the last I shall mention, and it contains a strong determination of the same court of C. B. on the general doctrine. It was made as late as 1817, and under the cool shade of peace.

In that case, a *Frenchman* at *Dunkirk*, in *France*, in time of war, having goods in the hands of the defendants, who were merchants at *London*, drew three bills of exchange on the defendants, which were duly remitted and accepted to be paid when the goods were sold. The goods were sold, and the proceeds received by the defendants. The bills were endorsed by the *Frenchman* to the plaintiff, an *Englishman* residing in *France*. Here was, then, the case of bills drawn and endorsed

IN ERROR.  by a *Frenchman*, and accepted by an *English* house, for a valu-
········   able consideration, during war, and the suit was not brought
ALBANY,    until after peace. And what did the court of C. B. say to the
January, 1819  action ? It is illegal, says Ch. J. *Gibbs*, for an alien, in an
GRISWOLD   enemy's country during war, to draw a bill on a subject re-
v.         sident in *England*, and then sue him after peace for the
WADDINGTON.  amount of such bill. It gives rise to a communication be-
tween subjects of both countries, which ought to be avoided.
The drawing, and the accepting of the bills, were acts in
themselves illegal ; all communication with an alien enemy,
during war, must be prohibited, and is so by the policy of
the law. " I therefore, most reluctantly conclude," he
observes, " that this was an unjust traffick with subjects of an
enemy's country, although there is no apparent dishonesty
in the transaction." Mr. J. *Dallas*, in giving his opinion,
said, that all trading with an enemy was illegal ; that every
contract of trading direct, or indirect, was of itself void,
*ab initio*. War puts individuals of every respective govern-
ment, as well as the governments themselves, into a state of
hostility with each other. The trading in this case was ne-
cessarily contradictory to a state of war. How could it be
said, that bills of exchange drawn by an alien enemy on a
subject of this country, during the time of war, were not
contracts ?

We here take our leave, for the present, of the *English*
courts. There is an entire harmony and uniformity of de-
cision, and that too from very early times, between their
courts of maritime and common law. *England* has adopted,
and steadily asserted, the same universal principle which we
have seen laid down by the most enlightened jurists, and
put in practice by the most commercial nations on the con-
tinent of *Europe*. We now return, with pleasure, from the
other side of the *Atlantic*, to look into the laws and decisions
of this country ; they will be found to have adopted the *Eu-
ropean* rule in its utmost extent.

The *United States* have been engaged in two wars :
The war of the revolution ; and the war which was decla-
red by Congress, in *June*, 1812. The sense of our govern-
ment on the subject of trade and intercourse with the enemy
has been fully and precisely declared in each of these wars.

1. As to the revolutionary war. By the association which Congress entered into in 1774, they agreed, in behalf of the then united colonies, that from and after the 10th of *September*, 1775, they would not, directly or indirectly, export any merchandise or commodity whatsoever to *Great Britain*, or her dependencies. Though the war had actually commenced before this resolution was to operate; yet, as our independence was not declared until the year following, the war had not then attained that solemn form recognized by public law between independent nations. There was no other prohibition of trade with *Great Britain* than this association, until that association became merged in the new character, and the new relations which the war assumed by the declaration of independence.

IN ERROR.

⋯⋯⋯

ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

The further steps taken by Congress to put a stop to intercourse with the enemy, will appear by their resolutions from time to time.

In *June*, 1778, a committee of Congress was appointed to report upon the means of preventing a correspondence by *letters* with the enemy; and upon their report, Congress earnestly recommended to the several states to take the most effectual measures to put a stop to so " dangerous and criminal a correspondence." (*Journals of Congress*, vol. 4. p. 254.)

The criminality of the correspondence, which was here assumed, must have arisen solely from the fact of there being open war between the *United States* and *Great Britain;* and it shows the sense of Congress, that even an epistolary intercourse with the enemy, in time of war, was unlawful and dangerous.

In *November*, 1780, Congress declared that the enemy had derived great supplies of provisions from a trade with the adjacent states, and that the penalty of that " criminal commerce," by the existing laws, were too slight; and they, therefore, recommended it to the legislatures of the several states, " according to the practice of most nations," to inflict capital punishment on all such persons as should, directly or indirectly, supply the enemy with provisions or stores. (*Journals of Congress*, vol. 6 p. 163.)

In *March*, 1781, Congress interfered on this subject, with

still greater solicitude, and more powerful energy. They ordained, " that the citizens and inhabitants of these *United States* be strictly enjoined and required to abstain from all intercourse, correspondence, or dealings whatsoever, with the subjects of *Great Britain*, while at open war with these *United States*, as they would answer the same at their peril; and the executives of the several states were called upon to take the most vigilant and effectual measures for detecting and suppressing such intercourse, correspondence, or dealings, and bringing the authors thereof, or those concerned therein, to condign punishment." (*Journals of Congress*, vol. 7. p. 60.)

This resolution must have been declaratory of the sense of Congress of the operation of the state of war. The persons concerned in any intercourse or dealings with the enemy were to answer at their peril. Now, I ask what peril, unless it be the peril of the common law, which Congress had already declared to be one of our indubitable rights, and which rendered all such intercourse and dealings a misdemeanour? There had been no specific penalty declared; and Congress had no legislative or judicial powers over the private citizens of these states. The appeal here was not to the state legislatures to provide laws for the occasion. The call was upon the state *executives* to suppress such intercourse, correspondence and dealing, and to bring the authors to punishment. The state executives had no other authority than to execute the existing laws; and I think the case a clear and demonstrable one, that in the opinion of that grave, wise, and illustrious assembly, all intercourse, correspondence and dealing with an enemy in time of war, were, by the mere force and circumstance of war itself, unlawful. ▪ ▪ ᵃ

But it appears, that Congress was still dissatisfied with the force and effect of the general law of the land, on the subject of illicit intercourse with the enemy. By their resolution in *June*, 1782, (*Journals*, vol. 7. p. 301.) they recited, that the enemy were encouraging a clandestine traffick, and that some of the inhabitants, prompted either by a sordid attachment to gain, or by a secret conspiracy with the enemies of their country, were " wickedly engaged in carrying on this

illicit traffick," whereby a market was provided for *British* merchandizes, the circulating specie exported, &c. They, therefore, recommended to the state legislatures, " to adopt the most efficacious measures for suppressing all traffick and illicit intercourse between their citizens, and the enemy, and to impress on the citizens the baneful consequences apprehended by Congress, from a continuance of this illicit, and infamous traffick."

It would appear to me to be impossible to raise even a doubt, after these opinions of Congress, so repeatedly and emphatically expressed, that during the course of our revolutionary war, all trading and intercourse between our citizens and the enemy, were deemed unlawful. It was held to be as repugnant to the maxims of sound policy, as it was to the laws of war, and the usage of nations. To what higher, or to what purer source can we resort for the declared sense of this country? Certainly, no assembly of statesmen, in any age or nation, ever displayed a more constant spirit of wisdom and energy, than the Congress which guided the councils, supported the armies, and sustained the courage of their countrymen, through the perilous conflict of the revolution.

The legislature of this state made new, and accumulative provisions, far beyond the rules of the common, or maritime law, in order the more effectually to suppress trade with the enemy. Thus, by the act of the 8th of *March,* 1779, (sess. 2. ch. 28.) it was declared, that all goods which should be brought from any place within the power of the enemy, without permission from the executive, should be liable to seizure and forfeiture, as the goods of the enemy. This provision was, perhaps, no more than what the common law, and the marine law, would have adjudged, though it is to be observed, that this penalty was applied to the goods of *every person,* whoever might be the person, though he should happen to be even a neutral, or an *American* citizen. The confiscation applied to every possible case, and was absolute. The only fact for inquiry was, did the goods come from any place within the power of the enemy?

The second section of the act went a great deal further, and declared, not merely that the goods should be forfeited,

VOL. XVI. 61

if captured on the passage, or *in transitu*, but that all sales and contracts for the sale of goods, brought from places within the power of the enemy, and clandestinely introduced for sale within this state, and all payments for the same, and all notes and bonds given in such payment, should be null and void from the beginning.

Our legislature, on this occasion, took the lead of the continental Congress; for this act was prior to those resolutions of Congress against trade with the enemy, which I have mentioned. And judging from the severity of these provisions, I apprehend, that if any person at that day, and before that law was passed, could have been permitted to have asked the senate or assembly of this state, whether they held it lawful for their citizens to go voluntarily and enter into commercial negociations with the enemy, the answer would have been one which would have chastised the presumption of the doubt.

Another act was passed on the 13th of *April*, 1782, (sess. 5. ch. 39.) entitled, " an act more effectually to prevent illicit trade with the enemy." By that act, all goods which should be brought from any place within the power of the enemy, were made liable to seizure and confiscation, as in the former law. But this act was full of severe provisions relative to the seizure, disposal, trial, and sale of the goods; and, I think, it cannot be doubted, that this, as well as the former act, was made in confirmation of the injunctions of the common and marine law; and that they only superadded more effectual provisions against a conduct which was already unlawful.

But I pass from the cases during the revolutionary war, to the decisions of the federal courts in the late war, in respect to trade and intercourse with the enemy.

In the case of *Brown* v. *The United States*, (8 *Cranch*, 110.) the question decided by the Supreme Court was one not connected with the present discussion; and I only notice the case for the sake of an observation of a learned judge of that court, whose researches have thrown great light on subjects of national and maritime law, and who has made distinguished efforts to transfuse the prize law of *Europe* into the law of this country. Mr. Justice *Story* observed, that

IN ERROR.
.......

ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

" no principle was better settled than that all contracts with an enemy made during war were utterly void."

The case of *The Rapid* was brought before the Supreme Court of the *United States*, on appeal from the Circuit Court for the district of *Massachusetts*, and was decided in *February*, 1814. (8 *Cranch*, 155.) It is a very strong case, and deserving of our closest attention; and the decision of the Supreme Court in that case, and the doctrine fairly involved in that decision, must be regarded by us all, as the undisputed law of the land.

The facts were, that an *American* citizen had purchased a quantity of *English* goods, in *England*, before the war, and deposited them on an island belonging to the *English*, near the province of *Maine*. Upon the breaking out of the war, he sent *The Rapid* from *Boston* to the island, to bring away the goods, and she was captured on her return by an *American* privateer, and the goods were condemned as lawful prize, on the ground that this was a trading with the enemy, by which the goods acquired the character of enemy's property.

We may advert to the opinion of Judge *Story*, as expressed in the decision of this cause, in the Circuit Court, (1 *Gall. Rep.* 295.) with the more confidence, as his decree was afterwards affirmed. He said, that " it must be considered as a settled principle of maritime and national law, that all trade with the enemy, unless with the permission of the sovereign, was interdicted, and subjected the property engaged in it, to the penalty of confiscation. That war put every individual of the respective governments, as well as the governments themselves, in a state of hostility with each other. That all treaties, contracts, and rights of property, were suspended. That the subjects were in all respects considered as enemies. That they might seize the persons and property of each other. That they have no power to sue in the public courts of the enemy nation. That it becomes, in the highest degree, criminal to comfort or aid the enemy; and, if so, what more important aid can be afforded, than by succouring his necessities in trade, and warding off the blows, aimed against his manufactures and commerce ? That it seemed difficult, for a moment, to sustain the opinion that

trade can subsist in a state of utter hostility, or that contracts and credits can be valid, when they are liable to confiscation, or that property may be passed, when it may be rightfully seized by the mere operations of war. That the principle seems to have been assumed from early times, and acted upon by almost all civilized nations; and the public edicts of sovereigns, prohibiting all commercial intercourse, can be considered in no other light, than as declaratory acts to warn their subjects against the effects of illegal conduct. That arguments from the hardship of a case were not properly addressed to a judicial tribunal, and if real, they might be obviated by a license from the government. That not only all trading, in its ordinary acceptation, but all communication and intercourse with the enemy were prohibited. That it was no wise important, whether the property engaged in the inimical communication be bought or sold, or merely transported and shipped. That the contamination of forfeiture was consummate, the moment the property became the object of illegal intercourse."

The decision founded upon this reasoning was brought in review before the highest judicial tribunal in the *United States,* and was argued with great talent and learning. The counsel for the claimant contended, that there was no trading with the enemy, nor any commercial contract or transaction between the party and the enemy, as the goods were purchased and paid for before the war. There was only the exercise of an act of ownership in removing a man's own property from the enemy's country, which he had a right to do. The counsel on the other side insisted, that all intercourse with the enemy was illegal, and subjected the property to confiscation as prize. That the claimant there had a voluntary intercourse with the enemy, and that by the common law, and the maritime codes of all the *European* nations, all intercourse with an enemy, not sanctioned by the sovereign power, was prohibited. That without this salutary provision, a wide door would be open for every species of treasonable intercourse. That any commercial intercourse with the enemy, was a trading, within the meaning of the term used in prize law, and for the very obvious reason,

that, if any kind of commercial intercoure was permitted, it would facilitate the means of improper correspondence.

IN ERROR.
••••••
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

The opinion of the Supreme Court of the *United States,* was delivered by Mr. Justice *Johnson* with much perspicuity, decision, and strength. He observed, that " it was the first case in which that court, since its organization, had been called upon to assert the rights of war against the property of a citizen." He said, that " by the war a new character had been assumed by the nation, which involved it in new relations, and imposed a new class of obligations on the citizens, and subjected them to principles of public law, highly penal in their nature, and too little understood."

" As to the nature and consequences of a state of war, there was really," he said, " no difference of opinion among jurists. In the state of war, nation is known to nation only by their armed exterior; each threatening the other with conquest or annihilation. The individuals who compose the belligerent states, exist, as to each other, in a state of utter occlusion. If they meet, it is only to combat. The universal sense of nations has acknowledged the demoralizing effects that would result from the admission of individual intercourse. The whole nation are embarked in one common bottom, and must be reconciled to submit to one common fate. Every individual of the one nation must acknowledge every individual of the other nation as his own enemy, because the enemy of his country. That the law of prize was part of the law of nations, and that by *trading,* in prize law, was meant not merely that signification of the term which consists in negociation or contract, but the object, policy, and spirit of the rule was to cut off all communication or actual locomotive intercourse between individuals of the belligerent states. That *intercourse* inconsistent with actual *hostility,* was the offence against which the operation of the rule was directed."

Here, then, we have the final consummation of this discussion, and the sanction of the doctrine we have been tracing, solemnly given by the highest judicial authority in the *United States.* It reaches to all interchange, or transfer, or removal of property, to all negociation and contracts, to all communication, to all locomotive intercourse, to a

state of utter occlusion, to any intercourse but one of open hostility, to any meeting but in actual combat. * * *

Can we, then, hesitate for one moment, to pronounce the dealings in 1814, between the *Griswolds*, and *H. W.* at *London*, as stated in the account current, and as proved by the purchase of the *Antigua* bills, to have been a private intercourse and commercial negociation unlawful by the law of the land? The Supreme Court did not carry their doctrine beyond the declared practice of nations, and the decisions of jurists. All the authentic and accurate writers on national law, had laid down the rule, that in war, the subjects of each country were enemies to each other, and bound to regard and treat each other as such. We have seen, that by the formal declarations of war made by *England*, and by other powers, " all correspondence and communication" were prohibited. *Heineccius* says, the individuals of one nation cannot *negociate*, that is, cannot transact any business with the inviduals of the other, when at war. *Cleirac* says, they cannot lawfully *confer*, or *negociate* with each other. *Valin* says, all *communication* is unlawful. The black book of the admiralty says, that they cannot *intercommune* with each other; and in the case of the *East India Company v. Sandys*, it was agreed, that all contracts and dealings with an enemy were unlawful. In the language of Sir *Wm. Scott*, there is a total interdiction of communication; and in the late case in *Taunton's Reports*, the drawing of a bill of exchange was held to be unlawful. In short, the resolutions of the Congress in the *American* war, reached to all intercourse, correspondence and dealing. Nothing new, was, therefore, laid down by the Supreme Court of the *United States*: Nothing but what had been adopted in all preceding wars: Nothing but what was built upon the accumulated wisdom of ages.

I will, however, take notice of one more decision of the Supreme Court, no less strong and pointed on the question before us. It was the case of the *Julia*, (8 *Cranch*, 181.) which, during the war, carried a cargo of provisions from *Baltimore* to *Lisbon*, and was captured on her return passage, with a cargo of salt, being the proceeds of the outward cargo. She was taken by an *American* frigate, and condemned at *Boston*, as good prize, because she sailed under a license and

passport from a *British* admiral. She had no intercourse whatever with the *British* at *Lisbon*, but the license was issued within our territory, by a *British* agent.

On the single ground of this license, the vessel was captured and condemned, and the opinion of the Supreme Court of the *United States*, was delivered by Mr. Justice *Story*. He laid down " as a fundamental proposition, that in war, all intercourse between the subjects of the belligerent countries was illegal, unless sanctioned by the authority of the government, or in the exercise of the rights of humanity; that the rule extended to every species of intercourse and communication, direct, or indirect; that it was a necessary result of a state of war, to suspend all negociations and intercourse between the subjects of the two states, and to place every subject in hostility to the adverse party. The subject is bound, by every effort of his own, to assist his own government, and to counteract the measures of its enemy. Every aid, therefore, by personal communication, or by other intercourse, which shall take off the pressure of the war, or foster the resources, or increase the comforts of the enemy, is strictly inhibited. No contract is considered as valid between enemies, so as to give them a remedy in the courts of either government." " The ground upon which a trading with the enemy is prohibited, is not the criminal intentions of the parties engaged in it, or the direct and immediate injury to the state. The principle is extracted from a more enlarged policy, which looks to the general interests of the nation, which may be sacrificed under the temptation of unlimited intercourse, or sold by the cupidity of corrupted avarice." " If such licenses be (as it is stated) an article of sale, I beg to know," he observes, " in what respect they can be distinguished from the sale of merchandize? If purchased directly of the *British* government, would it not be a traffick with the enemy? If purchased indirectly, can it change the nature of the transaction? If such licenses be a legitimate article of sale, will they not enable the *British* government to raise a revenue from our citizens? Can a part of the people claim to be at peace, while the residue are involved in war? It is unlawful, in any manner, to lend assistance to the enemy, by attaching our-

IN ERROR.
.......
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

selves to his policy, sailing under his protection, facilitating his supplies, and separating ourselves from the common character of our country."

I may now be permitted to ask, whether the purchase of bills on *England*, and especially of government bills, and making deposits with a mercantile house there, be not negociation and traffick, and that too of a pacific and mercantile character? In the language of the Supreme Court, was not the purchase of *British* government bills, enabling that government to raise a revenue from amongst us, and did not the remission and deposit of funds in the *British* capital, amount to a dangerous intercourse, by cherishing the resources, and relieving the wants of the enemy? Was not *H. W.* left at liberty to apply these funds of the plaintiffs, just as he pleased, in every species of active commerce? We have evidence before us, that he was engaged in large speculations during the last years of the war, and what evidence have we that these very funds were not so employed?

But it is said that the purchase and remission of bills to *England* was innocent and lawful, and that a debtor may make remittances in that way to his creditor; or, at least, that he may make remittances by way of deposit, until he shall have an opportunity to draw, or until it suits his convenience to apply the fund. I am persuaded that there is no colour in the books, nor any foundation in principle, for this distinction. It is commercial intercourse; it is negociation; it is communication with the enemy; and every thing of this nature is prohibited. It holds out all the inducements to the party arising from the love of traffick, of speculation, and of gain, to meet the wishes of the enemy, and to swerve from the duty which he owes to his country. How do we know that even the shifting of funds from *Antigua* to *London* was not auxiliary to the enemy's views? There may be a trade in bills as well as in goods or commodities; they are bought and sold in the market like other articles; and the purchase of government bills of the enemy enhances the value of them, and sustains the credit of the enemy. How came *British* government bills for sale, unless that sale was dictated by the wishes and wants of the enemy? The district judge of *Massachusetts*, in the case of *The Hiram*, was induced to think an inter-

course with the enemy to that extent was lawful; but it is to be observed, that, in that same case, he also held that sailing under an enemy's license was lawful, and that the decision was made before the Supreme Court of the *United States* had settled any of these cases relative to trade and intercourse with the enemy. The opinion of the district judge must be considered as completely overruled on both points by the decisions which we have reviewed. They are absolutely irreconcilable with each other. I think I may venture to hazard the assertion, without any imputation, after the examination which has been given to the subject, that there is no authority in law, whether that law be national, maritime, or municipal, for any kind of private, voluntary, unlicensed business, communication, or intercourse with an enemy. It is all noxious, and, in a greater or less degree, it is all criminal. Every attempt at drawing distinctions has failed; all kind of intercourse, except that which is hostile, or created by the mere exigency of war, and necessity of the case, is illegal. The law has put the sting of disability into every kind of voluntary communication and contract with an enemy, which is made without the special permission of the government. There is wisdom and policy, patriotism and safety, in this principle, and every relaxation of it tends to corrupt the allegiance of the subject, and prolong the calamities of war.

The idea that any remission of money may be lawfully made to an enemy, is repugnant to the very rights of war, which require the subjects of one country to seize the effects of the subjects of the other. The property so remitted, if in cash, or in any tangible subject, would become a just cause of seizure while on its passage. An alien enemy has no right of action during war, and he cannot sue, because it would be drawing resources out of the country; how then can it be lawful to make remittances to him? The law that forbids intercourse and trade, must equally forbid remittances and payment. On any other supposition, the propositions would be inconsistent with each other. We have a high authority on this very point, pronounced by Ch. J. *M'Kean*, of the Supreme Court of *Pennsylvania*, in the case

IN ERROR.
·······
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

IN ERROR.
.......
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

of *Hoare* v. *Allen*. (2 *Dall*. 102.) That case arose out of the revolutionary war, and was decided in 1789. The question was, whether interest was recoverable on a *British* debt during the war. The counsel for the defendant contended that all intercourse was at an end, and that no remittance could have been made during the war. The counsel on the other side said, that payment might have been made lawfully, at any time, in bills of exchange. Thus was this very point brought before the court; and it was held by all the court, that the exportation of commodities to *Great Britain* during the war was unlawful; and that it, therefore, became unlawful to make any remittances to the enemy. That the defendant could not have paid the money to the plaintiff, who was an alien enemy, without a violation of the laws of his country, *and of the laws of nations.* " That a remittance in bills of exchange would have furnished the enemy with the means of carrying on the war within the bowels of the country, without bringing any money into it. It was well known," says the court, " that the bills drawn by the *British* army, were the principal bills that were bought and sold." The defence of the defendant was, consequently, allowed.

Thus we have a plain and decisive authority on this very point, holding, that payments and remittances, even in bills, are unlawful in war, and that too by the law of nations.

In confirmation of the doctrine of that case, we have the decisions of Judge *Washington*, recently made in the circuit court of the *United States*, for *Pennsylvania*. (*Conn* v. *Penn*, and *Deniston & M'Gregor* v. *Imbric*, *April* and *May*, 1818.) He has there decided, that a debtor cannot make remittances to his creditor belonging to a nation at war with us, without violating his allegiance, because there is a prohibition of all intercourse with an enemy, during the war. But if that creditor, though a subject of the enemy, have a known agent here, the payment may be made to him, but then the agent cannot lawfully remit the money to his principal.

I have thus given the question arising on the legality of the contract on which this suit is brought, the fullest consideration in my power; and I have arrived with entire satis-

faction at the conclusion, that it is an unlawful contract, and cannot be sustained in a court of law.

Much of the interesting argument in this cause, on the part of the plaintiffs, would be properly addressed, in time of war, to the executive power of the country. It is the business of government, and not of courts of justice, to relax the rules of war. The power that declares, or carries on war, may soften its evils, to every extent consistent with the public interest, of which it is, in this instance, the exclusive judge. It is its bounden duty to make war fulfil its end with the least possible mischief, and to hasten the blessings of peace.

But we are met with the objection, that admitting the contract to be illegal, the defence cannot be set up by the defendant, because he was, by his partner *H. W.*, a party to such contract, and to raise such an objection would be a breach of faith.

There are several answers to be given to this objection.

In the first place, the defendant *Joshua W.* was certainly no party in fact to the dealings contained in the account current. If he is responsible at all, it can only be on the technical ground that the partnership continued during the war, from the want of due public notice of its dissolution. He had not, in fact, and in truth, any dealings with his brother during the year 1814, nor any dealings (as far as this cause is concerned) with either of the plaintiffs. His obligation to pay, if any such there be, arises from construction of laws ; his faith and conscience were never pledged for the payment of this debt, and the case affords no colour of reason for the conclusion that *Joshua W.* had any interest in, or derived any emolument from, the dealings of 1814. To impute any actual breach of faith in him, by this defence, would be manifestly unjust.

In the next place, the objection can only apply to the case in which the defendant is equally guilty with the plaintiffs, and no possible guilt can be imputed to the defendant. He was not concerned in this intercourse and trade. The communications and negociations were all direct between the plaintiffs and *Henry W.*, and never did a defendant appear

IN ERROR.
.......
ALBANY,
January, 1819.

GRISWOLD
*v.*
WADDINGTON.

before a court with better pretensions to take advantage of the illegality appearing on the face of the demand.

Again; as the Lord Chancellor of *England* said, in the late case of *Evans* v. *Richardson*, here is a trading between *American* citizens and an *English* subject, during time of war, in fraud of the laws of the country, and if the party has not set up the objection, the court will set it up.

If every defence was to be deemed perfidious, which was made to defeat an illegal contract, and was upon that ground to be overruled, what would become of the plea of the statute of usury, or of the statute of gaming, or of any other plea setting up the law of the land against a contract which had violated it? So broad an objection is not to be endured. Lord *Hardwicke* disregarded it in the case in 1 *Vesey*, 317. " Several cases," says he, " at common law and in equity, have gone upon this, that if the contract relates to an illicit subject, the court will not so encourage an action as to give a remedy. Nor is it any answer, that the defendant knew of this illegality, for this answer would serve in all these cases." Lord *Mansfield* placed the defence on true grounds, in *Holman* v. *Johnson.* (*Cowp.* 343.) " The objection," he observes, " that a contract is immoral or illegal, is not allowed for the sake of the defendant. It is founded on general principles of policy. No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act; *ex dolo malo non oritur actio.* If from the plaintiff's own stating, or otherwise, the cause of action appears to arise from a transgression of a positive law of the country, the court will not lend their aid."

It would be difficult to state any principle of law more plainly founded in common sense and true policy, than that which declares, that a plaintiff must not appear, from his own showing, to have infringed the law of the land; and if he does, he cannot avail himself of the law to enforce a contract made in opposition to law. The plaintiff must recover upon his own merits, and if he has none, or if he discloses a case founded upon illegal dealing, and founded on an intercourse prohibited by law, he ought not to be heard, whatever the demerits of the defendant may be. There is, to my mind, something monstrous in the proposition, that a

court of law ought to carry into effect a contract founded
upon a breach of law. It is encouraging disobedience, and
giving to disloyalty its unhallowed fruits. There is no such
mischievous doctrine to be deduced from the books. There
are cases in which a contract fair and lawful, as between the
two individuals, who are parties to it, is not to be contami-
nated by other transactions, which might precede, or which
might be the result of the contract. But even if an agent
be a party to an original transaction, and the money in his
hand be the proceeds of the illegal contract, no recovery
can be had. (*Vide,* on this subject, Lord *Kenyon,* and *Ash-
hurst,* J., in *Taylor* v. *Blair,* 3 *Term Rep.* 454. *Rooke,* J.
in 1 *Bos. & Pull.* 296. *Story,* J., in *Fales* v. *Mayberry,* 2
*Gallison,* 560. *Hunt* v. *Knickerbacker,* 5 *Johns. Rep.*
327. *Hodgson* v. *Temple,* 5 *Taunton,* 181. *Faikney* v. *Rey-
nous,* 4 *Burr.* 2069. *Petrie* v. *Hannay,* 3 *Term Rep.* 418.;
and the disapprobation of those two cases, in 14 *Vesey,* 192.
*ex parte Daniels.*) Lord *Alvanley* lays down the true rule in
*Monk* v. *Abel,* (3 *Bos. & Pull.* 35.) when he declares, that
" the principle to be extracted from the cases on this sub-
ject is, that no man can come into a *British* court of justice
to seek the assistance of the law, who founds his claims
upon a contravention of the *British* laws."

I now conclude, that as the contract in this case was
founded upon dealings during the late war, between the
plaintiffs, who were resident citizens of the *United States,*
and *Henry W.,* who was a natural born, and a resident sub-
ject of *Great Britain,* it was an unlawful contract, and can-
not be enforced in the courts of this country.

In this view of the subject, it becomes unnecessary to dis-
cuss the other point in the cause, whether the defendant was,
or was not, a partner with *Henry W.* during the war. The
intercourse and trading were not with him, but with the ene-
my partner, and he could not be bound by a contract which
was null and void when made by his partner.

But as the other point was largely discussed upon the ar-
gument, and was, indeed, the only one upon which the deci-
sion of the Supreme Court was placed, and as I cannot know
how far it may be deemed material by other members of

this court, I feel it to be my duty to express an opinion also upon that point. ✻ ✻ ✻

It appears to me, that the declaration of war did, of itself, work a dissolution of all commercial partnerships existing at the time between *British* subjects and *American* citizens. By dealing with either party, no third person could acquire a legal right against the other, because one alien enemy cannot, in that capacity, make a private contract binding upon the other. This conclusion would seem to be an inevitable result from the new relations created by the war. It is a necessary consequence of the other proposition, that it is unlawful to have communication or trade with an enemy. To suppose a commercial partnership (such as this was) to be continued, and recognized by law as subsisting, when the same law had severed the subjects of the two countries, and declared them enemies to each other, is to suppose the law chargeable with inconsistency and absurdity. For what use or purpose could the law uphold such a connection, when all further intercourse, communication, negotiation, or dealing between the partners, was prohibited, as unlawful? Why preserve the skeleton of the firm, when the sense and spirit of it has fled, and when the execution of any one article of it by either, would be a breach of his allegiance to his country? In short, it must be obvious to every one, that a state of war creates disabilities, imposes restraints, and exacts duties altogether inconsistent with the continuance of that relation. Why does war dissolve a charter-party, or a commercial contract for a particular voyage? Because, says *Valin*, (tom. 1. p. 626.) the war interposes an insurmountable obstacle to the accomplishment of the contract; and this obstacle arising from a cause beyond the control of the party, it is very natural, he observes, that the charter-party should be dissolved, as of course. Why should the contract of partnership continue by law, when equally invincible obstacles are created by law to defeat it? If one alien enemy can go on and bind his hostile partner, by contracts in time of war, when the other can have no agency, consultation, or control concerning them, the law would be as unjust as it would be extravagant. The good sense of the thing as applicable to this subject, is the rule

prescribed by the *Roman* law, that a copartnership in any
business ceased, when there was an end put to the business itself. *Item si alicujus rei societas sit, et finis negotio impositus est, finitur societas.* (*Inst.* 3. 26. 6.)

The doctrine, that war does not interfere with private contracts, is not to be carried to an extent inconsistent with the rights of war. Suppose that *H. & J. W.* had entered into a contract before the war, which was to continue until 1814, by which one of them was to ship, half yearly, to *London*, consigned to the other, a cargo of provisions, and the other, in return, to ship to *New-York* a cargo of goods. The war which broke out in 1812, would surely have put an end to the further operation of this contract, lawful and innocent as it was when made. No person could raise a doubt on this point; and what sanctity or magic is there in a contract of copartnership, that it must not yield to the same power?

If we examine, more particularly, the nature and objects of commercial partnerships, it would seem to be contrary to all the rules by which they are to be construed and governed, that they should continue to exist, after the parties are interdicted by the government, from any communication with each other, and are placed in a state of absolute hostility. It is of the essence of the contract that each party should contribute something valuable, as money, or goods, or skill and labour, on joint account, and for the common benefit; and that the object of the partnership should be lawful and honest business. (*Watson on Partnership*, p. 5—7. *Code Civil*, No. 1833. *Pothier, Traite du Contrat de Société*, No. 1. 8. 10. 11. 14. *Ferriere sur Inst.* 3. 26.) But how can the partners have any unity of interest, or any joint object that is lawful, when their pursuits, in consequence of the war, and in consequence of the separate allegiance which each owes to his own government, must be mutually hostile? The commercial business of each country, and of all its people, is an object of attack, and of destruction to the other. One party may be engaged in privateering, or in supplying the fleets and armies of his country with provisions, or with munitions of war; and can the law recognise the other partner as having a joint inte-

IN ERROR.
.......
ALBANY,
January, 1819.
‿‿‿
GRISWOLD
v.
WADDINGTON.

rest in the profits of such business? It would be impossible for the one partner to be concerned *in any commercial business*, which was not auxiliary to the resources and efforts of his country in a maritime war.   And shall the other partner be lawfully drawing a revenue from such employment of capital, and such personal services directed against his own country? We cannot contemplate such a confusion of obligation between the law of partnership and the law of war, or such a conflict between his interest as a partner, and his duty as a patriot, without a mixture of astonishment and dread.   Shall it be said that the partnership must be deemed to be abridged during war, to business that is altogether innoxious and harmless? But I would ask, how can we cut down a partnership in that manner without destroying it? The very object of the partnership, in this case, was, no doubt, commercial business between *England* and the *United States*, and which the hostile state of the two countries interdicted; or it may have been business in which the personal communication and advice of each partner was deemed essential, and without which the partnership would not have been formed.   It is one of the principles of the law of partnership, that it is dissolved by the death of any one of its members, however numerous the association may be; and the reason is this: the personal qualities of each partner enter into the consideration of the contract, and the survivors ought not to be held bound without a new assent, when, perhaps, the character of the deceased partner was the inducement to the connection.   (*Pothier, Traite du Contrat de Société*, No. 146. *Inst.* 3. 26. 5. *Vinnius, h. t.*)   Shall we say that the partnership continues during war, in a quiescent state, and that the hostile partners do not share in each other's profits, made in carrying on the hostile commerce of each country?   It would be then most unjust to make the party who did not share in profit to share in loss; and to be bound by the other's contracts; but if one partner does not share in profit, that alone destroys a partnership.   It would be what the *Roman* lawyers called *Societas leonina*, in allusion to the fable of the lion, who, having entered into a partnership with the other

animals of the forest in hunting, appropriated to himself all
the prey. (*Dig.* 17. 2. 29. s. 2. *Pothier, Trait. du Cont.
de Soc. n.* 12.) *o o ʋ^*

It is one of the fundamental principles of every commercial partnership, that each partner has the power to buy and
sell, and pay and receive, and to contract and bind the firm.
But then, again, as a necessary check to this power, each
partner can interfere and stop any contract about to be made
by any one of the rest. This is an elementary rule, derived from the civil law. In *re pari potiorem causam esse
prohibentis constat.* (*Pothier, Trait. du Cont. Soc. n.* 90.) But
if the partnership continues in war between hostile associates,
this salutary power is withdrawn, and each partner is left defenceless. If the law continues the connection, after it has
destroyed the check, the law is then cruel and unjust.

In speaking of the dissolution of partnerships, the
*French* and civil law writers say, that partnerships are dissolved by a change of the condition of one of the parties
which disables him to perform his part of the duty, as
by a loss of liberty, or banishment, or bankruptcy, or a judicial prohibition to execute his business, or by confiscation of
his goods. (*Inst.* 3. 26. s. 7. 8. *Vinnius,* h. t. 3. 26. 4. *Huberus in Inst.* lib. 3. tit. 26. s. 6. *Dig.* 17. 2. 65. *Pothier,
Cont. de Soc. n.* 147, 148. *Code Civil,* No. 1865. *Dict. du Dig.
par Thevenot Dessaules, Art. Societè,* No. 56.) The *English*
law of partnership is derived from the same source; and as
the cases arise, the same principles are applied. The principle here is, that when one of the parties becomes disabled
to act, or when the business of the association becomes impracticable, the law, as well as common reason, adjudges
the partnership to be dissolved.

*Pothier,* in his treatise on partnership, says, that every
partnership is dissolved by the extinction of the business
for which it was formed. This he illustrates, in his usual
manner, by a number of easy and familiar examples.

Thus, if a partnership be formed between two or more
persons, for bringing together, and selling on joint account,
the produce of their farms, or of their live stock, and the
produce or the stock of one of them should happen to fail,
or be destroyed, the partnership ceases of course, for there

IN ERROR.
.......
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

IN ERROR.

ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

can be no longer any partnership, when one has nothing to contribute. So, if two persons form a partnership in a particular business, and the one engages to furnish capital, or, the raw materials, and the other, his skill and labour, and the latter becomes disabled by the palsy, the partnership is extinguished, because the object of the partnership cannot be fulfilled. So, again, if two or more persons form a partnership to buy and sell goods at a particular place, the partnership is dissolved, whenever the business is terminated. (*Pothier, Trait. du Cont. de Soc.* No. 140—143.) *Extincto subjecto, tollitur adjunctum,* is the observation of *Huberus,* when speaking on this very point.

We can easily perceive with what force their doctrines apply to this case, for a partnership, formed between alien friends, must at once be defeated, when they become alien enemies. They can no more assist each other than if they were palsied in their limbs, or bereft of their understandings, by the visitation of providence. I have selected these principles of partnership from the treatise of *Pothier,* because his reputation and great authority, are known in this country. He has treated of the law of partnership, as he has of other civil contracts, with a clearness of perception, a precision of style, and a fulness of illustration, above all praise, and beyond all example. If it should be asked, why is *Pothier* silent, like the *English* law, concerning the effect of war on a partnership between the subjects of the two belligerent states, the answer may be given, that the possibility of such a question never could have occurred to a *French* lawyer, since it has been the law of *France,* for ages, that all intercourse, communication and commerce, between the subjects of *France* and her enemies, was prohibited, upon pain of death.

A good deal of stress was laid by the counsel for the plaintiffs, upon the affidavit of the defendant, made on the 9th of *March,* 1813, in which he speaks of the firms of *J. W. & Co.* and of *H. W. & Co.,* as then existing. But I think, that the criticism is susceptible of a satisfactory explanation.

Mr. *Ogden,* who drew the affidavit, says, that he had no particular instructions from the defendant, and that his attention was called to the persons composing the firms, in relation only to the subject matter of the petition. It is,

therefore, exceedingly probable, that the attention of the
party in making the affidavit, was not specially drawn to the
fact of the continuance of the partnership, down to that
day, because that was not a point material to the object of
the petition. Those who are obliged to examine long com-
plicated bills and answers upon oath, cannot but know, that
we are to look to the object and purport of the pleading,
and are not to hold responsible the conscience of the party,
for a mistake or error, (perhaps in grammatical expression,)
in some immaterial part of the document. There is no
doubt, that here was, upon the construction of the affidavit,
a mistake in point of fact. The partnership of *H. W. &*
*Co.* did not continue, in the common meaning of the term,
down to the 9th of *March*, for, by the letter of *H. W.* of
the 9th of *January* preceding, he speaks of the actual dis-
solution of the partnership, and says, that "a proper line
was struck in the books, and cash, and that the defendant
was no longer interested in any losses or profits on that side."
There is another circumstance in the case, that is impor-
tant. The goods imported, were by the firm of *J. W. & Co.*,
and the firm of *H. W. & Co.* was a distinct one, not consisting
of the same persons, and had no concern with that shipment.
The mention of the firm of *H. W. & Co.* (and which is the
only firm involved in the present case,) was altogether unne-
cessary in the affidavit, and was mere surplusage. How un-
reasonable, then, would it be, to draw an unfavourable infe-
rence against the rights of a party, from such a mistake in
an immaterial part of a paper? But in another sense, and
indeed, in the true sense, in respect to the object of the pe-
tition and affidavit, the assertion was true, and a partnership
was then existing. The parties were still partners as to
those goods which had been actually purchased by them be-
fore the war, and the parties, as partners, were bound to ac-
count to each other for the proceeds of those goods, and
equally bound as partners, to pay for them, if not already
paid for. A dissolution of a partnership only has respect
to the future. The parties remain bound for all antecedent
engagements. The partnership may be said to continue as
to every thing that is past, and until all pre-existing matters
are wound up and settled. In *Wood* v. *Bradick*, (1 *Taunt.*

IN ERROR.
.......
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

IN ERROR.
.......
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

104.) it was observed by one of the judges, that when a partnership is dissolved, it is not dissolved with regard to things past, but only with regard to things future. With regard to things past, the partnership continues, and always must continue. In reference, therefore, to the subject to which the affidavit applied, they were still partners, bound to account, and bound to pay, as partners, for that shipment.

And, after all, what has the intention of the defendant to do with the question before us ? If the law holds all partnerships in war between the subjects of the hostile states unlawful, it was not in the power of the parties to create, or to continue a partnership, in defiance of law. Suppose two or more persons enter into a partnership, or convert an old partnership to unlawful purposes, as, for instance, to carry on a contraband trade, or to commit piratical depredations, under some *Mexican* flag, would the law regard such an association ? Nothing can be plainer than the proposition, that if parties could not lawfully form, or carry on commercial business together, during the war, every agreement for such a purpose would be null and void.

Another objection was raised, from the want of notice of the dissolution of the partnership. The answer to this is extremely easy, and perfectly conclusive. Notice is requisite when a partnership is dissolved by the act of the parties, but it is not necessary when the dissolution takes place, by the act of the law. The declaration of war, from the time it was duly made known to the nations, put an end to all future dealings between the subjects and citizens of the two-countries, and, consequently, to the future operation of the copartnership in question. The declaration of war was, of itself, the most authentic and monitory notice. Any other notice, in a case like this, between two public enemies, who had each his domicil in his own country, would have been useless. All mankind were bound to take notice of the war, and of its consequence. The notice, if given, could only be given by each partner in his own country ; and there it would be useless, as his countrymen could not hold any lawful intercourse with the enemy. It could not be given as a joint act, for the partners cannot lawfully commune together.

But, it was said, that the peace had a healing influence, and restored the parties to all their rights, and arrested all confiscations, and forfeitures, which had not previously and duly attached. I do not know that I differ from the counsel in any just application of this doctrine. As far as the war suspended the right of action existing in the adverse party prior to the war, that right revived, but if the contract in this case was unlawful, peace could not revive it, for it never had any legal existence. So too, the copartnership being once dissolved by the war, it was extinguished forever, except as to matters existing prior to the war.

There are no cases in the *English* books, exactly in point, because the case of the validity of an existing partnership between the subjects of two belligerent powers, does not appear ever to have been raised. The presumption, I think, is, that it has been deemed too difficult a proposition to be even hazarded. As far as any connection with the enemy, by any contrivance, or under any cloak or pretension, has been discovered, the courts in *England,* and in this country, have been sharp and vigilant to detect, and to punish it. Thus, in the case of *The Vigilantia,* (1 *Rob.* 1.) it was decided, that if a person be concerned in a house of trade, in an enemy's country, in time of war, he shall not protect himself by mere residence in a neutral country. The traffick stamps a national character on the individual. So, though the managing partner resided in a neutral country, yet the property belonging to the partners in *England,* was, by the *English* admiralty, condemned, because the transaction was, as to them, illegal, though it was done without their immediate privity or direction. (*Case of the Sampsons,* cited in the case of the *Franklin,* 6 *Rob.* 127.) So, where a trade was carried on with the enemy by a house composed partly of neutrals, and partly of *British* subjects, Sir *Wm. Scott* held, (*The Franklin,* 6 *Rob.* 127.) that the sleeping *British* partner could not be lawfully concerned in a transaction, in which he could not be engaged as a sole trader. He could not do by a partner or agent, what he could not do by himself. In short, it is already settled, that a subject of one belligerent cannot be concerned in any commercial establishment among the subjects of the other,

without being deemed an enemy, in reference to such a con-cern. Nor can he be concerned in any such trade, indi-rectly or circuitously, through the intervention of a neutral port, or through the agency of third persons. (*The Jonge Pieter,* 4 *Rob.* 79. *The Samuel,* 4 *Rob.* 284. 1 *Wheaton,* 74.) And to avoid all imposition or difficulty, as to the national character of a party, it is settled, that the domicil, or fixed residence of the party at the commencement of the war, determines his character for the war. (8 *Cranch,* 253. *The Venus. The Indian Chief,* 3 *Rob.* 26.) It appears, also, to have been very recently decided by the Supreme Court of the *United States,* (if we may rely on the informa-tion just received,) (*a*) that if a house of trade be established in the enemy's country, and one of the partners resides in a *neutral country,* his share as well as that of his co-partner, resident in the enemy's country, is liable to condemnation, as prize of war.

These cases lead us to the conclusion, that the defendant could not have any concern whatever, directly or indirectly, in any trade or commerce of *H. W.* during the war, without involving his property in the penalty of an illicit connec-tion. How is it possible, then, that any partnership could legally subsist? If the partnership property of one part-ner be subject to capture by the other partner, and if the joint property be subject to capture by the subjects of either power, nothing can place in a more striking light the ab-surdity, as well as illegality of any partnership between two belligerents in time of war.

Having thus endeavoured to show the law to be settled, that the contract in this case, made with *H. W.* was unlaw-ful, and, consequently, not binding on the defendant, even if he had been a partner; and it also appearing to me, that the partnership existing before the war, was from reason and necessity dissolved by the act of war, it follows, that upon either ground, the judgment of the Supreme Court ought to be affirmed.

VAN VECHTEN, Senator. After the able review of the au-thorities cited in the argument of this cause, by his honour

*a* The case here alluded to, is that of *The Friendschaft,* decided, *Fe-bruary* 25th, 1819, and since reported, 4 *Wheaton,* 105.

the Chancellor, in the learned and elaborate opinion which
he has delivered, I shall confine myself to the general doc-
trines which I have extracted from the elementary writers
and adjudged cases, so far as I deem those doctrines appli-
cable to the points to which my opinion is directed.

Much has been said by the counsel in argument, about
the very serious consequences that will result to the unsuc-
cessful party, from our decision ; and the illegality of the
demand on one side, and the immorality of the defence on
the other, have been alternately arraigned with great inge-
nuity, force and eloquence. All this was allowable to the
counsel ; but I feel that my duty as a judge, forbids that I
should permit such suggestions to influence my judgment.
This court is called upon to pronounce the law as it is. If
its doctrines are unreasonably severe, it is the province of
another department to mitigate their severity. The parties
have placed their cause before us, for a final judgment,
according to the existing law of the land.

In the view which I have taken of this case, only two of the
questions that were raised at the argument, are necessary
to be considered :

1. Whether the declaration of the late war by the *United
States* against *Great Britain*, dissolved the partnership, (if
any,) which then existed between the defendant, *Joshua
Waddington*, and his brother *Henry Waddington?* and,

2. Whether the plaintiff's demand is so tainted with ille-
gality, that it is not recoverable ?

In considering the first question, a brief recurrence to the
facts connected with it is indispensable. It appeared to be
admitted in argument, on both sides, that *Joshua* and *Henry
Waddington* were native subjects of *Great Britain;* and that
they became naturalized citizens of the *United States* some-
time after the close of the revolutionary war ; that *Joshua
Waddington* has ever since resided in the city of *New-York;*
and that several years prior to the late war with *Great Bri-
tain*, he and *Henry Waddington*, and a Mr. *Newby* established
a mercantile house in the city of *New-York*, under the firm
of *Joshua Waddington & Co. ;* that *Joshua* and *Henry Wad-
dington*, about the same time, established a commercial
house in the city of *London*, under the firm of *Henry Wad-
dington & Co. ;* and that *Henry Waddington* then returned to

IN ERROR.
·······
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

*England*, and took the charge of the house in *London*, where he has ever since resided.

Such are the material facts upon which the question arises, whether the declaration of war dissolved the partnership of *Henry Waddington & Co.* ? I will now proceed to discuss the law on the subject.

*Domat* (tit. 8. sec. 5. art. 11.) says, " that when a partnership has relation to a thing that happens to perish, or of which the commerce ceases to be free ; as, if the partnership was of some lands taken by the enemy in time of war, it is at an end. So, also, when one of the partners is out of a condition of acting, he is, with respect to the partnership, as if he were dead." (*Ib.* sec. 15.) In order to apply this doctrine, I here ask, what was the principal object of the partnership between the Messrs. *Waddingtons* ? Taking the evidence before the court for my guide, I feel warranted to infer, that its primary object was to carry on trade between the *United States* and *Great Britain.* Why, else, did the parties establish two commercial houses, one under the firm of *Joshua Waddington & Co.* in the city of *New-York*, and the other in the city of *London*, under the firm of *Henry Waddington & Co.* ? This inference is confirmed by the immense shipments made by the *English* house to the house in *New-York*, and the large remittances from the latter to the former, which were so impressively dwelt upon by the plaintiff's counsel in argument. Do these facts admit of any other fair deduction, than that the partners intended the two establishments, as a means to facilitate their commercial operations between the two countries, and to make the business of one establishment, subservient to the business of the other ? If they do not, I ask, whether the principal object of the partnership, to wit, the commerce between the *United States* and *Great Britain*, to which it had a special relation, continued to be free after war was declared ? For, if it did not, then, according to the doctrine of *Domat*, the partnership was at an end, at the very moment when the war took place.

But how does the law of war, *per se*, bear upon the question ? By that law, no principle is more clearly established, than that when war takes place between two nations, all com-

mercial intercourse between them must immediately cease.

Hostilities once commenced, any attempt at trading, on the part of the subjects of either state, unless by the permission of the sovereign, is interdicted, and becomes, *ipso facto,* a breach of the allegiance due to their respestive sovereigns, and as such, is interdicted by the general maritime law of *Europe*; by that law, which does not spring from this or that particular state, but which, having its source in natural reason and natural justice, is alike binding on the whole community of the civilized world. So indisputable is this proposition, so necessarily does it grow out of the very nature of war itself, that all the great writers who have treated on the law and practice of nations, assume it as a point which is incontrovertible." (*Grotius*, b. 3. c. 4. sec. 8. *Bynkershoeck*, b. 1. c. 3. *Vattel*, b. 3. c. 4.)

In *Potts v. Bell,* (8 *Term Rep.* 561.) Lord *Kenyon* considered the doctrine, that trading with an enemy was illegal, as finally settled in *England*, with reference to the authorities cited in argument by the king's advocate, and as applicable to the common law as well as to the admiralty courts. And this is the law, not of *England* only, but also of this country, judicially recognised and settled by the Supreme Court of the *United States.* In the case of *The Julia*, Judge *Story* assumed it as " a fundamental proposition, that in war all intercourse between the citizens and subjects of the belligerent countries is illegal, unless sanctioned by the authority of the government, or in the exercise of the rights of humanity;" and he cites *Valin* as going to the full extent of his doctrine. And in the case of *The Rapid*, (8 *Cranch*, 161.) Judge *Johnson* asserted the same doctrine in language equally explicit and unqualified. He said, " the universal sense of nations has acknowledged the demoralizing effects that would result from the admission of individual intercourse between belligerents. The whole nation is embarked in one common bottom, and must be reconciled to one common fate. Every individual of the one nation must acknowledge every individual of the other nation, as *his* enemy— because *the enemy* of *his country.*"

It, therefore, appears to be the established law of our own country, as well as of *Europe*, that the commerce, to which

IN ERROR.

••••••

ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

the partnership between the Messrs. *Waddingtons* related, not only ceased to be free, but, in point of fact, perished; and *Joshua Waddington* (to repeat the language of *Domat*) was out of a condition of acting as partner with *Henry Waddington*, when the war took place. If so, it results, incontrovertibly, that the partnership ceased. For nothing can be more incongruous than, that a legal partnership should exist, when the commercial objects of it are rendered illegal; when the partners are placed in hostile array against each other by their respective governments; when there can be no communication between them, without a breach of their allegiance; and when, instead of co-operating and furnishing aid to each other, for mutual profit, it is made the paramount duty of each to attack the other, seize his goods, and do him all the harm in his power.

But several objections have been urged against the applicability of this doctrine to the present case. · I shall briefly notice such of them as appear to me the most cogent.

It has been said, that the partnership of the Messrs. *Waddingtons* was not confined to a trade between this country and *Great Britain*, but that it embraced the internal and neutral commerce of the two countries, which the war did not interdict.

This objection rests on mere presumption, and is repelled by the positions chosen by the partners, for their commercial houses, as well as by the course of their business, as far as it has been disclosed by the evidence in the case. In order to sustain the presumption, that internal and neutral commerce entered materially into the views of the partnership, some facts or circumstances should appear to warrant it. What are the facts and circumstances before us, from which such a presumption can reasonably be deduced? I have not been able to discover any.

Admitting, however, for the sake of argument, that such facts and circumstances exist, I would ask, how the presumption can avail the plaintiffs? Judge *Johnson*, in the case of *The Rapid*, (8 *Cranch*, 160, 161.) before cited, said, " the individuals who compose the belligerent states, exist as to each other, in a state of utter occlusion, and that each must acknowledge the other as his own enemy, because the

enemy of his country." Then it would seem to follow, as a necessary consequence, that all intercommunication and cooperation between the citizens and subjects of belligerent states, for any purpose, unless sanctioned by government, becomes unlawful, when the war takes place. In this state of things it is not easy to discover how a commercial partnership between the Messrs. *Waddingtons* could lawfully be continued, even for the purposes of internal and neutral commerce. In the case of *The Emulous*, (1 *Gall.* 571.) Judge *Story* said, " that all contracts with an enemy, made during war, are utterly void; and that this principle has grown hoary under the reverend respect of centuries, and cannot now be shaken without uprooting the very foundation of national law." Trading supposes the existence of civil contracts and relations, and a reference to courts of justice, and the rights of property. But these are inconsistent with a state of war. How, then, can any kind of partnership trade, carried on between belligerents, be recognised as lawful ; and if it is not lawful, how can it have a legal existence ?

Again ; it has been urged, that war does not annul preexisting civil contracts, but only suspends their enforcement. Be it so ; let me examine whether this impugns the doctrine which I have laid down as applicable to this case. And here I concede the proposition, that war does not, *ipso facto*, release an enemy debtor from his bond to an enemy creditor; but then it must be admitted, on the other hand, that the law of war interdicts the latter from receiving the fruits of his bond during the war. Why ? because, in order to his receiving those fruits, there must be a communication between the parties; and there must be a remittance of funds by the debtor to the creditor, which is unlawful. The belligerent nation, of which the former is a citizen or subject, has a right to retain the funds under its own control while the war continues. Is this consistent with the nature and object of a commercial partnership, which requires the aliment of a free intercourse, and mutual co-operation and control of funds by the partners, for its support ? Indeed, it was frankly acknowledged in argument, by one of the plaintiff's counsel, that the suspension of such a partnership by war, involved its dissolution.

But in order to test the argument more closely, let me for a moment suppose, that war merely suspends the contract of partnership. What is the obvious conclusion? Can either partner bind the other by his acts during the suspension? If he can, it presents the case of a contract suspended, and not suspended; operative, and yet its operative principles rendered dormant by the law of war. Such an incongruity is, in my judgment, wholly irreconcilable with the dictates of reason, and of course, repugnant to every just notion of sound law.

It was also urged in argument, that, inasmuch as *Henry Waddington* was a naturalized citizen of the *United States*, he had an election, when the war took place, to return to his adopted country, and, therefore the partnership in question was not subject to dissolution by the war, until he had determined his election.

This argument, I apprehend, proves too much, to benefit the plaintiffs. For it involves an admission, that in case *Henry Waddington* elected to remain in his native country, the dissolution would follow; and, in point of fact, the case shows that he did remain there. Besides, it must be remembered, that the house of *Henry Waddington & Co.*, being established in *London*, his return to the *United States* would, of itself, have broken it up. But I do not mean to place my opinion on such narrow ground.

In the case of the *Indian Chief*, (3 *Rob. Rep.* 12.) Sir *William Scott* said, "no position is more established than this, that if a person goes into another country, and engages in trade, and resides there, he is, by the law of nations, to be considered as a merchant of that country." In the case of *M'Connel* and *Hector*, (1 *Bos. & Pull.* 113.) Lord *Alvanley* said, "that while an *Englishman* resides in a hostile country, he is a subject of that country." In the case of *The Venus*, the Supreme Court of the *United States* recognize the same doctrine, and Judge *Washington*, in delivering the opinion of the court, said, "that a person who removes to a foreign country, settles himself there, and engages in the trade of the country, furnishes, by these acts, such evidence of an intention permanently to reside there, as to stamp him with the national character of the state where he resides;" and he adds, "having once acquired a national character, by

IN ERROR.

••••••

ALBANY,
January, 1819.

GRISWOLD,
v.
WADDINGTON.

residence in a foreign country, he ought to be bound by all the consequences of it, until he has thrown it off, either by an actual return to his native country, or to that where he was naturalized, or by commencing his removal, *bona fide*, and without an intention of returning." The reasonableness of this doctrine must strike the mind of every reflecting man ; for who cannot, upon a moment's consideration, perceive, that without it, the mixed character of a native or naturalized citizen or subject of one belligerent nation, remaining in the country of the other belligerent, for commercial pursuits, would afford a cloak for every kind of fraud against the laws of both countries. I conclude, therefore, that according to the settled law of *Great Britain,* as well as of our own country, *Henry Waddington* had the national stamp of a *British* subject, when the war took place, and by his continued residence in that country, the impression has remained ever since. How, then, can his mere naturalization here, long anterior, remove it, so as to exempt his commercial partnership with a citizen of the *United States,* from the dissolving effect of the war ?

Again ; it has been zealously contended, that *Joshua Waddington* had acknowledged the continuance of the partnership after the war began, and that due notice has not been given of its dissolution, which was indispensable to exonerate him from joint responsibility with *Henry Waddington.*

Neither of those positions, in my opinion, can be of any avail to the plaintiffs. For, suppose the Messrs. *Waddingtons* had expressly agreed to continue their partnership during the war, and this is putting the matter in the strongest light in favour of the plaintiffs, the question instantly recurs, would such an agreement have been valid ? Surely, if the law of war is settled, as I think it is, it inhibits such a relation between belligerents, and takes from them the legal capacity of forming it. This brings me to the point, whether a void contract can create any legal obligation : a point upon which, I apprehend, no plausible doubt can be raised. And, in my opinion, the objection that due notice has not been given of the dissolution of the partnership, is equally unsound. What notice does the law require to be given of an effect produced by its own operation ? On whom does the duty,

IN ERROR.
........
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.

of giving notice in such a case, devolve? The act of dissolution by war emanates from the sovereign power of the government, without the personal assent of either of the partners, and is usually announced by the government in the most formal and public manner to the whole world. Every person, of every nation, is bound to take notice, at his peril, of such annunciation, and of the duties which it enjoins, and of the prohibitions which it involves. Those duties and prohibitions are prescribed by the law of nations, and attach, especially, to the citizens and subjects of the belligerent nations, as soon as the war commences. Were the plaintiffs ignorant of the state of war, when the demand, which they set up against the defendant, *Joshua Waddington*, accrued? This has not been pretended. Nay, it cannot be pretended ; for one of them went into the enemy's country under the protection of the cartel some months previous. It must, therefore, be assumed as a fact, that the plaintiffs had due notice of the war, and, of course, they were bound to take notice, at their peril, of its legal effects upon the partnership relations between the defendant, their fellow *American* citizen, and *Henry Waddington*, a subject of the enemy.

I have, therefore, brought my mind to the conclusion, that the declaration of the late war, by our government, against *Great Britain*, dissolved, *ipso facto*, the then subsisting partnership (if any,) between the defendant, *J. W.* and his brother *H. W.*

The next question to be considered is, whether the plaintiffs' demand is so tainted with illegality, that it cannot be recovered by law ?

In order to come to a correct result upon this point, it is requisite, in the outset, to ascertain how, and when the demand accrued, and to bear in mind, that the plaintiffs were then native *American* citizens.

The action was brought against *J. W.* and *H. W.*, to recover a balance of 3,627*l.* 11*s.* 1*d.* sterling, with interest from the 1st of *January*, 1815 ; but *J. W.* alone was arrested. The declaration contained the usual money counts, and one on an *insimul computassent*. The defendant demanded a bill of particulars, which was rendered, containing, *inter alia*, an account current, dated, *London*, 1st of *Ja-*

*nuary*, 1815, commencing the 1st of *January*, 1814, signed
*Henry Waddington & Co.*, and stating the above balance.
This account was afterwards offered in evidence, at the
trial of this cause, to prove the plaintiffs 'demand.

Hence, it appears, that the plaintiffs' demand arises out of
transactions between them, and a mercantile house in *London*,
conducted by *H. W.*, in the name of *H. W. & Co.*, during
the late war; and this presents the interesting question,
whether that demand is recoverable?

To resist the recovery, the defendant objects, that the
transactions on which the demand is bottomed, were illegal.
If this objection is founded in law, the defendant is legally
entitled to the benefit of it.

But, in what does the illegality insisted on, consist? The
remittance of funds to an enemy, *flagrante bello*. Here,
then, the law of nations must again be resorted to as a
guide.

It has already been observed, that war puts an end to all
civil contracts between the belligerents, and that trading
with an enemy is criminal, because it affords him aid, in the
most effectual manner, by enabling the merchants of the
enemy's country to support their government. If these
principles are correct, they apply with peculiar force to the
remittance of funds.

In the case of *The Julia*, (8 *Cranch*, 194.) before cited,
Judge *Story* said, that " independent of all authority, it
would seem a necessary result of a state of war, to suspend
all negociations and intercourse between the subjects of the
belligerent nations. By the war, every subject is placed in
hostility to the adverse party. He is bound, by every effort
of his own, to assist his own government, and to counteract
the measures of its enemies. Every aid, therefore, by per-
sonal communication, or by other intercourse, which shall
take off the pressure of the war, or foster the resources, or
increase the comforts of the public enemy, is strictly inhi-
bited." In the case of *The Emulous*, (1 *Gallis.* 571.) the
same judge said, " that all contracts with an enemy, made
during war, are utterly void." These doctrines bear de-
cisively against the plaintiffs' demand, which rests on the
remittance of money and bills by them, or their order, to

IN ERROR.   *H. W. & Co.,* *London,* during the war. Was not this fos-
• • • • • •    tering the resources of the enemy, by placing *American*
ALBANY,    funds within his control? And was not the intercommuni-
GRISWOLD   cation, in relation to those funds, between the plaintiffs, as
v.         *American* citizens, and a *British* merchant residing in the
WADDINGTON.
city of *London,* without the sanction of our government,
unlawful? Upon this point, there is not the shadow of a
doubt, if the universally acknowledged law of nations, re-
cognized and established, not in *England* only, but in this
country also, by the highest judicial authorities, is to be re-
garded and enforced by this court.

Again; this action, if sustainable at all, must be supported
by the evidence in the case, of an express, or implied legal
contract between the plaintiffs and *H. W. & Co.,* made
*flagrante bello;* but Judge *Story,* in the case of *The Julia,*
(8 *Cranch,* 194.) said, that it was " the necessary result of
a state of war, to suspend all negociations and intercourse
between the subjects of the belligerents." And in the case
of *The Emulous,* (1 *Gallis.* 561.) he pronounced " all con-
tracts with an enemy, made during war, utterly void."
Why? because they are inhibited by the laws of war, and,
therefore, illegal.

The plaintiffs' counsel, however, have laboured to make
a distinction between the remittance of bills, and the remit-
tance of money, to an enemy in time of war, and to limit
the war inhibition to the latter. But, in my opinion, they
failed, wholly, to establish the distinction. In one part of
the argument, it was said, that there was no illegality in re-
mitting bills to *London,* in time of war. Is this true, when
applied to a belligerent? Did not those bills transfer funds
to the enemy? If they did, was not such transfer unlawful?
Again; it was said, that drawing bills on funds in the ene-
my's country did not increase the enemy's resources. Ad-
mit it. Does that remove the taint of illegality attached to
the placing those funds there? By whom, for whom, and
for what purpose, were they placed in the hands of an ene-
my? Could they be placed there, *flagrante bello,* without
an unlawful communication and negociation between bellige-
rents? This has not, and cannot be shown; and, therefore,
the distinction is unfounded. Again; in another part of

the argument, it was urged, that the case furnishes evidence to warrant a presumption, that our government sanctioned the remittance of bills to *England, flagrante bello.* Let me examine, for a moment, the bearings of this argument, and the facts on which it is founded. In the first place, it seems to concede, that governmental authority was necessary to legalize the remittance, and this concession impugns the former position, that such remittance was lawful, without the sanction of government. But, the facts relied on to support the presumption, do not justify it, in relation to the plaintiffs. It is true that bills, to a large amount, were remitted in *cartels*, with the knowledge of our public officers, and received in *England*, with the knowledge of the officers of the *English* government. Nor is it to be wondered at, that the government of *Great Britain* should countenance such remittances, in any form, from an enemy, inasmuch as they increased her resources. But how does it appear, that the *American* government, directly, or indirectly, sanctioned the remittances made by the plaintiffs, or their agent, Captain *Stewart?* Those bills were not sent by a *cartel*, with the privity of our government, or one of its officers. My reasoning, on this subject, and the cases which I have cited, admit the authority of government, to license dealings with an enemy. Had the plaintiffs such a license? It cannot be inferred, that, because the government did, in particular instances, and in a particular mode, tolerate the remittance of bills to *England*, during the war, therefore, it had given an unqualified sanction to such remittances by *American* citizens, for any purpose, and in any way they should deem expedient. On the contrary, the facts in this case, repel the presumption of an unqualified sanction; for they limit the authority given, to particular cases of remittance by *cartels*, and under the inspection of our public officers.

But, it has been contended on the part of the plaintiffs, that the objection of illegality cannot be made by the defendant, for that his partner received the plaintiffs' money as a mere agent; and that the defence of illegality, set up by him, is a breach of honour and morality, to enable him to retain the plaintiffs' money.

<div align="right">
ALBANY,
January, 1819.

GRISWOLD
v.
WADDINGTON.
</div>

I will examine each of these positions, in the order in which I have stated them.

The first position takes for granted, that the plaintiffs placing their money in the hands of *Henry Waddington & Co.*, *flagrante bello*, created a legal obligation on the defendant to account for it ; but this is the very point in controversy. *Henry Waddington* was, at the time, in the view of the law of nations, an alien enemy ; and it was unlawful for the plaintiffs, as *American* citizens, to place their money in his hands. Had *Henry Waddington* expressly agreed to pay it on demand, the contract, to use the language of Judge *Story*, in the case of *The Emulous, would have been utterly void.* Is, then, the law so incongruous, that it will, by implication, create a valid contract, where an express contract would have been illegal ? In my opinion, it cannot be necessary to discuss this point any farther, in order to show that the first position contended for by the plaintiffs is wholly untenable.

With respect to the second point, that the defendant's defence involves a breach of honour and moral obligation, it must be remembered, that this cause is brought up for review, not to settle speculative points of honour, or rules of morality, but to have the law of the land, between the parties, judicially pronounced. When the law inhibits all negociation and intercourse between the citizens and subjects of belligerent nations, such negociation and intercourse are rendered unlawful. When it declares all contracts with an enemy, made in time of war, utterly void, it announces to all who may enter into such contracts, that the law will not enforce them. Thus legally forewarned of the consequences, the plaintiffs who come into a court of law with such a contract, cannot claim the shield of honour and morality for its protection. The court has not the power to transform an illegal, into a legal contract; and without such a transforming power, it is incompetent to afford a legal remedy to the plaintiffs in this case.

But it was said in argument, that the rigour of the law of war has been mitigated by the practice of all civilized nations. Admit it; has the inhibition of commercial intercourse, of pecuniary negociations, and of fostering the re-

sources of an enemy, unless sanctioned by government, ever been removed? No. Why is it continued? For the safety of the belligerent states, to guard against treasonable practices, and to save merchants from temptations to swerve from their allegiance in time of war. Judge *Story*, in explaining the principle of this inhibition, in the case of *The Julia*, (8 *Cranch*, 195.) said, that it is extracted, not from the criminal intentions of the parties engaged in illicit intercourse with an enemy, but " from a more enlarged policy, which looks to the general interests of the nations, which may be sacrificed under the temptation of unlimited intercourse, or sold by the cupidity of corrupted avarice." And in the language of Sir *William Scott*, I would ask, emphatically, who can be insensible to the consequences that might follow, if every person had a right to carry on a commercial intercourse with the enemy, and under colour of that, had the means of carrying on any other species of intercourse he might think fit?

It, therefore, appears, that the unqualified inhibition of all intercourse and negociations with an enemy, by the law of war, unless sanctioned by government, is dictated by the great law of self-preservation, which is immutable in its nature, and has not been relaxed by any nation. The inconvenience to the public, by relaxing it, might be extreme; and there can be none on the other side, that the intercourse between individuals of the belligerent nations, if necessary, should be placed under the eye and control of the government charged with the care of the public safety.

Upon the whole, I have a strong conviction that the contract relied on by the plaintiffs, was illegal and void; and that, therefore, as well as for the reasons before assigned, the judgment of the court below ought to be affirmed.

This being the opinion of a majority of the court, (Livingston and Seymour, Senators, dissenting,) it was, thereupon, ORDERED, ADJUDGED, and DECREED, that the judgment of the Supreme Court be *affirmed;* and that the plaintiffs in error pay to the defendant in error, his costs and charges in and about his defence in this court; and that the record and proceedings be remitted, &c.

Judgment of affirmance.