## Case No. 17,729.

### WILLIAMS v. MOBILE SAV. BANK.

[2 Woods, 501.][1]

Circuit Court, S. D. Alabama. June Term, 1875.

BILLS OF EXCHANGE — EFFECT OF WAR — DRAWEE IN CAPTURED CITY — RIGHTS OF PAYEE.

1. A bill of exchange, drawn by a bank in Mobile while that city was in possession of the Confederate forces, on a bank in New Orleans, after that city had surrendered to and was occupied by the Federal forces, is void.

2. Such a bill is void, even though the payee of the bill, at the time he received it, supposed the city of New Orleans was still occupied by the Confederate forces.

3. But where the payee of a bill of exchange paid therefor to the drawer the face value thereof, without knowledge of the fact that the territory where the drawee resided had fallen into possession of a government at war with the government of the drawer, and it turned out that by reason of that fact the bill was void: Held, that the payee was in no fault, and could recover from the drawer, on the common counts, the money paid for the bill.

On the 15th of May, 1862, the plaintiff's intestate took from the defendant, the Mobile Savings Bank, at Mobile, Alabama, a bill of exchange, of which the following is a copy: "State of Alabama, Mobile Savings Bank, Mobile, May 15, 1862. No. 4491. Pay to order of A. A. Williams, Ten Thousand Dollars. C. W. Gazzam, Cashier. To the Bank of New Orleans. New Orleans, La." This bill was afterwards indorsed by the payee to the order of Payne, Huntingdon & Co., and was by them transferred back to Williams, the payee. This suit was brought by the administrator of the payee, against the Mobile Savings Bank, to recover the money paid for the bill.

The first count of the complaint was for money had and received. On this the defendant took issue.

The second count alleged that Williams, the plaintiff's intestate, being a citizen of West Baton Rouge, in the state of Louisiana on the 15th of May, 1862, while passing through Mobile, Alabama, deposited $10,000 with the defendant, and took from it a bill, being the bill above described, and at that time said intestate did not know that the city of New Orleans had fallen into the possession of the army of the United States; that he proceeded to his home in West Baton Rouge, Louisiana, and inclosed said bill to

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

Messrs. Payne, Huntingdon & Co., of New Orleans; that before the draft reached them, Gen. Butler, then in command of the United States forces at New Orleans, issued a proclamation declaring martial law. in said city, and declaring Confederate States currency valueless, and prohibiting its circulation as currency; and that in consequence it became valueless in New Orleans; and that about the 26th of. May, 1862, Gen. Butler gave to the Bank of New Orleans, upon which the bill was drawn, permission to return to the said defendant all Confederate currency or bonds held by said Bank of New Orleans which belonged to the defendant, and the defendant did then and there withdraw and take full possession of all its funds in said Bank of New Orleans, and left nothing with which to pay said bill. but withdrew the identical funds upon which said bill was drawn, and has not since made any provision for the payment of said bill or any part of it, nor had the defendant any right to expect the same would be paid.

The third count was substantially the same as the second.

The fourth count claimed $10,000 as due from the defendant upon the said bill of exchange, and it averred that it was presented for payment to the proper officer of the Bank of New Orleans after the city of New Orleans fell into the possession of the forces of the United States, and payment was refused. The count then averred that before the late Civil War was terminated, to wit: in May, 1862, the defendant withdrew the identical funds on which the bill was drawn, and, at the same time, closed its accounts and dealings with the Bank of New Orleans, and has never since had any money in said bank with which to meet said draft; and the defendant has not since made any provision for the payment of the draft, nor had it any right to expect that the Bank of New Orleans would pay it.

The fifth count is based on the bill of exchange, of which a copy is given, and it is averred that it was presented for payment and payment was refused, and the bill was protested and due notice given to defendant.

The sixth count was predicated on the bill of exchange, and avers that the identical money in the Bank of New Orleans upon which the bill was drawn was withdrawn by defendant, and that defendant withdrew at the same time all its money from the Bank of New Orleans, and left no money to pay the bill. The common money counts were added.

Demurrers were filed to the second. third, fourth, fifth and sixth counts. The ground of demurrer was that the claims mentioned in these counts were shown to be founded on a consideration declared by the law of the land to be illegal and invalid, and that said bill of exchange was drawn in violation of the laws and policy of the United States.

Wm. Boyles and G. Y. Overall, for plaintiff.
R. H. Smith, R. I. Smith, and P. Hamilton, for defendant.

WOODS, Circuit Judge. There can be no doubt, it seems to me, that the bill of exchange, upon which some of the counts are based, is void, and no action can be maintained upon it. It is a part of the public history of the country, and it has been expressly held by the supreme court of .the United States (The Venice, 2 Wall. [69 U. S.] 258; The Ouachita Cotton, 6 Wall. [73 U. S.] 521), that the city of New Orleans was subjugated and brought under the control of the Federal forces on the 6th of May, 1862. It continued in the possession of the Federal army until the close of the late war of Rebellion. At the time the bill sued on was drawn, Mobile, where the drawer—the Mobile Savings Bank—resided, was within the Confederate lines. The bill, therefore, was one drawn by a party within the Confederate lines, requesting the payment to the payee by a party within the Federal lines, of the sum of $10,000. The bill was therefore void. Griswold v. Waddington, 16 Johns. 438; Philips v. Hatch [Case No. 11,094]; Montgomery v. U. S., 15 Wall. [82 U. S.] 399; Wools. Comm. Int. Law, § 117; Britton v. Butler [Case No. 1,903]; Ouachita Cotton, 6 Wall. [73 U. S.] 521; Woods v. Wilder, 43 N. Y. 164. An attempt is made to take the case out of the rule by the averment in the second and third counts to the effect that at the time of taking the bill the plaintiff's intestate did not know that the city of New Orleans, which was the residence of the drawee, had fallen under the control of .the Federal forces. I do not think this helps the plaintiff's bill. The rule which makes a bill given under these circumstances void is founded on the most imperative considerations of public policy. It is to prevent any intercourse across the lines of the contending armies, or any temptation to intercourse, and it is to prevent the enemy from drawing means to carry on his war from within the territory of the state with which he is at war. It was against public policy to allow a bank within the Confederate States to withdraw its assets from within the lines of the United States. It is therefore immaterial whether or not Williams, the intestate, at the time he received the bill, knew that it was drawn upon a bank which was then within the Federal lines. The public interest demanded that such bills should not be drawn, no matter what the parties knew or did not know. The counts of the declaration, therefore, which are based upon the bill of exchange, cannot be maintained. and the demurrer to them is well taken. These are the fourth, fifth and sixth.

The common money counts are of course not open to the objection that they are founded on a void paper. Nor do I think the sec-

.ond and third counts are. These counts are not based. upon the bill, but upon a deposit of money made by the plaintiff's intestate, for which he received a void bill of exchange. The second and third counts seem to me to be rather counts for money of plaintiff's testator, had and received by defendant, for which the plaintiff's intestate had. taken a bill of exchange, the issuing of which was against public policy, and therefore void. The second and third counts, therefore, present the question, whether, under the circumstances of public history, and the facts detailed in these counts, the plaintiff can recover back the money which he paid for the void bill. • It is a general and well settled rule of law, that where parties have been engaged in an illegal transaction, the courts will not aid either of them, but will leave them where they have placed themselves. "In pari delicto, melior conditio possidentis." Meyers v. Meinrath, 101 Mass. 366. See 2 Rob. Prac. 478, where the cases on this subject are collected. But it seems to me that the averment made in the second and third counts that plaintiff's testator. at the time he received the bill, had no knowledge that the city of New Orleans had fallen under Federal control, takes the case out of this rule. It is when parties are in fault that the law refuses to aid them. If the bill had been drawn before New Orleans fell, the transaction would have been a lawful one. The plaintiff avers that his intestate, when he took the bill, did not know the fact that the city of New Orleans had fallen. · There was, therefore, no purpose on his part to violate any law or public policy. He ought not to be punished. He is in no fault. Why should .he lose the money which he paid over to the bank when he supposed he was doing a per- ·fectly lawful act? It seems to me that un- ·der the circumstances stated in the second and third counts, it would be against equity to allow the bank .to hold on to the money, and that there is no rule of law which forbids the plaintiff from recovering it. The distinction here drawn is taken by the adjudged cases. Thus, it has been held in an action on a promise to indemnify, that if the act directed or agreed to be done' is known at the time to be against law, an express promise to indemnify would be void. But if it was not known at the time to be unlawful, the promise to indemnify is a good and valid promise. See 2 Rob. Prac. 299, 300, and numerous cases there cited. If the Mobile Savings Bank had knowledge of the fall of New Orleans. while the plaintiff's intestate was ignorant of it, and the bank put off on him a bill which was rendered void by the fact of the fall of the city, it seems clear that the plaintiff could recover the money, for the parties would not be in pari delicto, and it would be a most unconscionable fraud to allow the bank to keep the money of the plaintiff's intestate in such a case. But suppose

neither party to the transaction had knowledge of the facts which made it illegal; then neither party is in fault, and there is no rule of law or of public policy which forbids the courts from placing the parties in statu quo. It would, under such circumstances, seem to be the case of money paid under a mistake of fact, which might be recovered .back.

In accordance with these views, the demurrers to the fourth, fifth and sixth counts are sustained, and the demurrers to the second and third are overruled.